**UNITED STATES of America,
Appellant,**

v.

**Fred C. WERNENTIN, Esther Wernentin, Robert J. Jester and Bobbette Jester, Appellees.**

**Fred C. WERNENTIN, Esther Wernentin, Robert L. Jester and Bobbette Jester, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 17633, 17688.**

United States Court of Appeals Eighth Circuit.

Dec. 27, 1965.

John C. Owen, Washington, Iowa, for Fred C. Wernentin and others.

David I. Granger, Atty., Tax Div., Dept. of Justice, Washington, D. C., for the United States with Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson, Harry Baum, Attys., Tax Div., Washington, D. C., and Donald A. Wine, U. S. Atty., Des Moines, Iowa.

Before VOGEL and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

BLACKMUN, Circuit Judge.

At issue here is the character—as long-term capital gain or as ordinary income—of a partnership's net receipts under certain Dairy Queen contracts during the calendar years 1951–1953, inclusive.

The taxpayers are Fred C. Wernentin and his wife Esther and Robert L. Jester and his wife Bobbette. The partnership, known as Wernentin and Jester, was originally one between the two men but on January 1, 1952, was expanded to include their wives.

The net receipts in question were reported in the filed partnership returns as ordinary income and were correspondingly reflected in the taxpayers' individual returns. The taxpayers bring this suit to recover the difference in tax which results if the income qualifies as long-term capital gain. Judge Van Pelt, in a thoughtful and scholarly opinion (described as "an extremely able decision" in 3B Mertens, Law of Federal Income Taxation, § 22.12, note 94 (Supp. 1965), and § 22.93, note 65 (Supp.1965)), held that that Dairy Queen income which was received under a 1949 contract, hereinafter described, was capital gain but that that which was received under a 1951 agreement did not so qualify and was ordinary income. Wernentin v. United States, 218 F.Supp. 465 (S.D. Iowa 1963). These conclusions resulted in the entry of judgment in favor of the respective taxpayers for each of the tax years but in amounts less than they claim are due. Both sides appeal.

The facts are not in dispute. Dairy Queen is a soft-serve dairy product dispensed from a patented freezer machine directly to the customer. J. F. McCullough and H. A. McCullough are father and son. Esther Wernentin and Bobbette Jester are mother and daughter. Mrs. Wernentin is a daughter of J. F. McCullough. The male McCulloughs possessed trademark rights in the name Dairy Queen and, under grant from the

patent holder, the right to manufacture and use the freezer. They also had the right to effect subcontracts with others.

*The McCullough-Jester arrangement.* In 1948 the McCulloughs by written "Freezer and Territory Agreement" granted to Jester (evidently acting on behalf of the partnership) the right to use the freezer and the trademark within the State of New Jersey. This right apparently was an exclusive one; at least the parties understood it to be so. The agreement called for Jester's ordering freezers through the McCulloughs and taking up adjustments directly with the manufacturer; the payment to the McCulloughs and to the patent owner of specified amounts per gallon of mix used or sold; the maintenance of records to which McCullough and the patent owner were to have access; the non-removal of any freezer from New Jersey for purposes of operation; and the non-use of "any other frozen or semi-frozen dairy product" or any other freezer without the prior written consent of the McCulloughs. Jester was given "the right to subdivide the State of New Jersey from time to time among other subcontractors subject to prior approval" of the McCulloughs but he was to give a copy of each subcontract to the McCulloughs and to the patent holder. He was obligated to have a designated number of stores in operation by stated dates. He was to collect a starting fee, between $1,000 and $2,000, from each subcontractor and to pay one-third of it to the McCulloughs. His maximum gallonage charge to an operator was not to exceed 29¢. Title to the territory was said to remain in the McCulloughs "until released in part under contracts approved by" them. This was the basic agreement between the McCulloughs and Jester and was the contract which gave Jester, and hence the partnership, the interest with which the present controversy is concerned.

Jester himself also operated personally at least one store in Iowa from 1949 on.

*The May 5, 1949 contract.* This was a "Freezer and Territory Agreement" between Jester and Robert U. Dinkins. By it Jester, who then lived in Iowa, gave Dinkins exclusive and perpetual Dairy Queen rights, including the right to subcontract, in three New Jersey counties. Dinkins agreed (a) not to move any freezer outside the territory for operation; (b) to order freezers through Jester and to have Jester negotiate defective parts adjustments with the manufacturer; (c) to pay $333.33 on the starting date of each of the first three stores and $1,000 on the starting date of each store thereafter; (d) to pay, by monthly remittance, 19¢ per gallon on all mix used or sold; (e) to charge in all further subcontracts maximums of $2,000 as a starting fee and 29¢ per gallon for mix; (f) to furnish Jester copies of each subcontract within ten days; (g) to maintain records of mix and freezers to which Jester, H. A. McCullough, and the patent holder all were to have access; (h) to sell Dairy Queen as "the only product" on the premises and to use no other type of freezer unless, in either event, written permission was first obtained from Jester; (i) to use only high grade equipment and mix; and (j) to perform in accord with the following:

"10. That the Buyer shall make every effort to have at least Three (3) Dairy Queen establishments within the above described territory in complete and continued normal seasonal operation on or before October 1, 1949. These may be his own stores or under sub-contract. In the event the Buyer does not have the required number of stores in operation on or before the above required date, then, at the option of the Seller, the Buyer shall lose his rights to further develop the above described territory. The rights of the Buyer to operate under this agreement shall continue only for the areas under sub-contract, plus areas within a two mile radius of any store or stores which the Buyer may own himself."

The contract also provided that every subcontract "must have the written con-

sent and approval of [Jester] before it is dated and signed."

It is to be observed that most of the provisions of this Jester-Dinkins contract were in line with, and undoubtedly occasioned by, the provisions of the Mc-Cullough-Jester contract. Certainly the two were parallel. Specifically, however, the agreement with Dinkins contained, perhaps naturally, at least four provisions which have no precise counterparts in Jester's agreement with the Mc-Culloughs: The first was Jester's option in paragraph 10 to terminate Dinkins' development rights. The second was the requirement that Dinkins purchase "only high grade equipment, supplies, and mix, produced and distributed by reputable concerns". The third was the provision for Jester's making adjustments with the manufacturer as to defective parts. The fourth was Jester's power, broader than McCullough's, to control the handling of other products.

Subsequent to the 1949 contract Jester and Dinkins executed four supplemental agreements (one of them subsequent to May 5, 1951) by each of which Dinkins was given similar Dairy Queen rights in additional New Jersey territory. This was effected by what essentially were incorporations of the 1949 agreement by reference. Three of these contracts recited the payment by Dinkins to Jester of a lump sum upon execution.

*The May 5, 1951 contract.* On this date Jester and Dinkins executed still another agreement. This contract applied to what appears to be the remainder of New Jersey. For the most part it followed the very form and content of the 1949 agreement but it differed from the earlier contract in that (a) it called for a flat $1,000 payment for each new store, (b) it fixed the gallonage payment at 21½¢, and (c) it contained the following new and different paragraph 10:

"10. That the Buyer shall make every effort to secure the establishment of Dairy Queen stores within the above described territory at desirable locations until said territory has been fully developed. In

the event the Buyer defaults in his performance of the terms, conditions and provisions of this agreement, and the Seller desires to exercise his right to extinguish the Buyer's rights to further develop the above described territory, the Seller shall furnish the Buyer with Ninety (90) Days written notice by registered mail to the address herein given, notifying the Buyer of the termination of said rights."

We therefore have in the 1951 contract, as we have in the 1949 agreement, at least four particular provisions which have no counterparts in Jester's agreement with the McCulloughs: The first is the termination right set forth in paragraph 10. The second is the requirement as to the purchase of only high grade equipment and mix. The third concerns adjustments for defective freezer parts. The fourth is the product control.

So much for the literal language of the formal contracts. A word as to the parties' conduct thereunder is in order:

Dinkins had three stores in operation by October 1949. He eventually developed 116 stores in New Jersey.

Jester and Dinkins observed the terms of their contracts closely. Jester exercised most of his rights and held Dinkins to most of his obligations. On the few occasions Dinkins deviated from his contract obligations he acted only with Jester's consent. Thus, Dinkins began to place freezer orders directly with the manufacturer but only when Jester had agreed to this practice after arranging with the manufacturer to fill the orders only with his approval. Jester exercised his power to control the sale of non-Dairy Queen products although he deferred to Dinkin's wishes. Jester permitted Dinkins to execute a subcontract before submitting it for approval, for it would then come to him along with an order for equipment and thus "made less work". This was the reverse of the procedure prescribed by the contract but the essentials of submission and approval were not relaxed. Although Jester did not exercise his right to examine the

books, neither did he excuse Dinkins from keeping records and submitting reports. On an occasion or two a new subcontractor was excused from making the lump sum payment; this was only with Jester's express approval.

From the start, however, a close relationship existed between Jester and the New Jersey operations which went beyond the strict terms of the contracts. Jester knew that Dinkins lacked experience and familiarity with the Dairy Queen business and that he would have to be given help to develop the area properly. Jester's assistance took many forms. At Dinkins' request he provided a mix formula and store blueprints without requiring the use of either. He prepared and mailed to New Jersey operators a news and promotion bulletin which came out several times a year. Usually these were signed "Bob and Bob", designating Jester and Dinkins. The bulletins contained material distributed by the national development organization, items written by Jester conveying technical information and relating to the business generally, and items designed to assure control over individual operators.

Another aspect of Jester's participation in the business in New Jersey centered in his leadership at statewide Dairy Queen meetings held once or twice a year. Suppliers assumed the major portion of the cost of these meetings and Dinkins made the physical arrangements. Jester publicized them in the bulletins, conferred with Dinkins about them, was in attendance, and usually presided.

In addition to these meetings Jester traveled to New Jersey two or three times a year on Dairy Queen business. On these trips he would confer with Dinkins concerning the New Jersey operations. During the years 1951–1953 he spent about fifteen days per year on New Jersey trips and an average of five hours per week working on New Jersey Dairy Queen business at his home in Iowa.

There were still other incidental ways in which Jester promoted and participated in the business. At the 1953 state convention he entertained 50 operators and their wives. He bore half the cost of favors sent to operators who attended a regional convention in New York the same year. He ordered and bore part of the cost of stationery used in New Jersey. He ordered and advanced payment for certain roof signs on the New Jersey stores. He adapted an ammeter and stocked Dairy Queen parts for sale to New Jersey operators. He testified that most of these activities were not required by the contracts but were done at Dinkins' request. He felt, however, that they contributed to the success of the New Jersey operations.

The record also indicates that there were certain modifications in the gallonage payments from the specified contract figures. This appears to have been somewhat related to the means of financing the national organization.

The expenses of these activities of Jester were asserted as deductions in the partnership returns.

As we have observed, the district court drew a distinction between the 1949 agreement and the 1951 agreement. It reasoned that the 1949 agreement and the four supplements effected sales and that receipts thereunder—the gallonage payments as well as the store starting fees—constituted "consideration for the rights transferred." It reasoned, in contrast, that the 1951 agreement did not effect a sale because Jester "retained rights to terminate which are inconsistent with a finding of sale". P. 473 of 218 F.Supp.

The controlling statute is § 117(a) of the 1939 Code as amended. This, in subdivision (1), defines the term "capital assets" to mean, with stated exclusions, "property held by the taxpayer" and, in subdivision (4), the term "long-term capital gain" to mean "gain from the sale or exchange of a capital asset held for more than 6 months".

The long-term capital gain provision usually provides a benefit for a taxpayer. We have recently observed that in these ordinary income-capital gain

situations each case is to be decided upon its particular facts; that no fixed formula exists for resolving the issue; that the statutory phrase "capital asset" is to be narrowly applied; that its exclusions are to be interpreted broadly; and that "every day operations of a business are directed to ordinary income or loss rather than to capital gain or loss". Frank v. Commissioner, 321 F.2d 143, 148 (8 Cir. 1963).

No question, however, is raised here as to the qualification of Jester's Dairy Queen interest as a capital asset, within the definition of § 117(a) (1), and we therefore begin with the premise that it so qualifies. The question, then, is whether the taxpayers, by the 1949 and 1951 contracts, respectively, effected a "sale", within the meaning of § 117(a) (4). They have the burden of proving facts which entitle them to capital gain treatment. Carter's Estate v. Commissioner, 298 F.2d 192, 194–195 (8 Cir. 1962), cert. denied 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404; Haggard v. Wood, 298 F.2d 24, 25 (9 Cir. 1961).

Before proceeding further as to the application of § 117(a), we should perhaps refer at this point to § 117(q). This has to do with patent rights and reads:

"(q) Transfer of patent rights.—

(1) General rule.—A transfer * * * of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(B) contingent on the productivity, use, or disposition of the property transferred."

Section 117(q) was added to the 1939 Code only in 1956 but was made applicable back to the tax years in question here. This was done in order to give to patents the same treatment in these years as permitted by § 1235 of the 1954 Code and by administrative ruling for the period prior to May 31, 1950. See United States v. Zacks, 375 U.S. 59, 62–64, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963).

Although the district court, p. 469 of 218 F.Supp., may have concluded that § 117(q) has some application to the fact situation of the case at bar we do not agree. The section by its terms concerns "all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights". Regulations 118, § 39.117(q)–2(c), as added by T.D. 6324, 1958–2 C.B. 923, and applicable to our tax years, specifically excludes, from the concept of an "undivided interest" in all substantial rights to a patent, "a right to the income from a patent, or a license limited geographically, or a license which covers some, but not all, of the valuable claims or uses covered by the patent". Here the Jester-Dinkins contracts, if they can be said to concern a patent at all, conferred only New Jersey rights, and thus were limited geographically; also, Dinkins was subject to restrictions in the sale of the freezers and otherwise. At most, § 117 (q) constitutes no more than an interesting sidelight for us. It has no direct application or conclusive effect here.

Aside from any guidance afforded by decided cases, and upon our independent analysis, we would conclude that Jester, in his dealings with Dinkins, did not effect sales, within the meaning of § 117(a) (4), and that the relationship between Jester (and hence the partnership) and Dinkins, considered in its entirety, smacked more of license than of sale.

We are unable, furthermore, to draw any distinction between the 1949 and the 1951 contracts although, as we have noted, the two agreements differed importantly in their respective paragraphs

10 and in other details not important here. We feel that these differences were not of a stature which compels one income tax result under the earlier contract and a contrary result under the later.

Both the 1949 and 1951 contracts provided, among other things, that: (a) Dinkins was to order freezers through Jester; (b) Jester, not Dinkins, was to take up with the manufacturer any adjustment for defective parts; (c) each subcontract effected by Dinkins was to have the written approval of Jester; (d) Jester's prior written permission was required before another product could be sold on a store's premises and before a freezer could be sold or other type of freezer used; and (e) Dinkins was to purchase "only high grade equipment, supplies, and mix, produced and distributed by reputable concerns".

The 1949 contract called for "every effort on the part of Dinkins to have at least three outlets in full operation by October, and provided that if he did not, then, at Jester's option, Dinkins would lose his rights to develop the territory further. And the 1951 contract provided that Dinkins was to make "every effort" to establish stores until the territory was fully developed; if he defaulted in the performance of the agreement, Jester had the right to extinguish and terminate Dinkins' rights of further development.

We might of course apply to all these rights possessed by Jester the convenient label of a condition subsequent. We choose not to do so, for we feel that, instead, they tend to characterize the relationship existing between the parties and to demonstrate that Jester retained an interest in the New Jersey Dairy Queen operations which was substantial and which was, in character, active commercial participation. The record does not convince us that the change in the form of paragraph 10 between the two contracts suggested a fundamental transformation in the parties' relationship or an intended step back from what had been sales to what was now to be something less than a sale for the remainder of New Jersey.

We think it fair here, and highly appropriate, to take into account the very activities of the parties themselves once the 1949 contract was effected. When we do this, our inclination in favor of something less than sale is greatly strengthened. Jester's posture was not that of one who had sold his interest. He worked closely with Dinkins in ways which, it seems to us, went beyond those to be expected from a paternalistic seller interested in his vendee's welfare and, sequentially, in his own protection. His firm and constant adherence to the requirements of the contracts, his involvement with the national, his providing a formula and blueprints, his preparation and distribution of the bulletin over their names jointly, his attendance and leadership at New Jersey meetings, his regular travel from Iowa to New Jersey, his weekly work at his Iowa home on New Jersey business, his attention to operational details, and his incurrence of costs in convention and other matters, all provide the substance of participation and retention of a property interest, rather than of sale and the mere protection of existing rights. For what it is worth— and we realize nomenclature is not conclusive, Watson v. United States, 222 F.2d 689, 691 (10 Cir. 1955); Wing v. Commissioner, 278 F.2d 656, 659 (8 Cir. 1960); Oak Mfg. Co. v. United States, 301 F.2d 259, 261–262 (7 Cir. 1962),— Dinkins himself conceded that "I never took it as a buying and selling deal, no", and that he did not feel that he had complete control over the development of the Dairy Queen operation in New Jersey.

We read all this as indicative of the interpretation which the parties themselves gave to their contracts. This demonstrates their true attitude and understanding and we construe those contracts accordingly. Eastmount Constr. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34, 39 (8 Cir. 1962). This rule has been applied even specifically to a Dairy Queen contract. McLeod v. Crawford,

176 Neb. 513, 126 N.W.2d 663, 668 (1964).

Four courts of appeals, however, have already considered the income tax aspects of Dairy Queen arrangements similar to the ones between Jester and Dinkins. Necessarily, out of deference, we cite these cases and attempt to measure their impact and authority on the facts before us. Each, incidentally, was decided after the 1951 Jester-Dinkins contract was executed.

The first case was Dairy Queen of Oklahoma, Inc. v. Commissioner, 250 F.2d 503 (10 Cir. 1957). The taxpayer there owned Oklahoma interests similar to those Jester acquired for New Jersey. It entered into subcontracts for Oklahoma operations. By these (a) the taxpayer retained ownership in the freezers; (b) the other party agreed to receive training from the taxpayer; (c) the taxpayer agreed to furnish the formula; (d) it retained the right to approve the source of the mix supply; (e) lump sum and gallonage payments were called for; (f) the taxpayer had the right to audit records; (g) the location of the store was subject to the taxpayer's approval; (h) construction, supplies and sanitary conditions were to conform to standards imposed by the taxpayer; (i) no products other than Dairy Queen were to be sold; (j) the taxpayer's consent was required for a transfer of the contract; (k) the other party agreed that, on termination, he would not compete for five years; and (l) the taxpayer had the right to remove freezers for violation of "any of the material obligations" of the agreement.

The Tax Court (Judge Arundell), in an opinion reviewed by the full court and with no dissents, held that the subcontracts were mere licensing arrangements and not sales, that "there are too many restrictions in these agreements to justify a holding or a finding that any sale or exchange took place", and that both the lump sum and gallonage payments were ordinary income. 26 T.C. 61, 70–71 (1956). The Tenth Circuit, however, in a split decision, reversed and remanded. The majority felt that "the traditional test of ownership is the power to exclude others"; that the contract payments were "intended to insure uniform standards"; and that these were conditions subsequent and not designed to reserve to the grantor any property right in the franchise. "Nor do we think the provisions with respect to the gallonage payments impair such exclusive right". Judge Lewis, in dissent, felt that the contract was "a licensing agreement for the marketing of a trademarked article under the strict supervision of the licensor"; that the restrictions were not conditions subsequent; that they indicated the desire of the grantor to retain control of the product; and that the agreement assigned only an operational function.

The next case was Gowdey's Estate v. Commissioner, 307 F.2d 816 (4 Cir. 1962). That taxpayer had obtained Virginia rights from McCullough and executed subcontracts for operations there. The terms of these were essentially the same as those in the Oklahoma case. The Tax Court again held that the agreements were nothing more than licensing arrangements and denied capital gain treatment. The Fourth Circuit reversed as to the store payments, feeling, pp. 818–819, that as to them the transaction "had every essential characteristic of a sale" and that the agreements "carried a general, absolute and perpetual proprietorship in the privileges". The restrictions, it said, were only necessarily protective and did not effect the retention of any substantial right, although it recognized difficulty in the provision prohibiting transfer without the taxpayer's permission. It relied on the Oklahoma case. In a supplemental opinion, however, p. 820, the court made it clear that the gallonage payments were something else again; that only the store payments were consideration for any sale; that the gallonage "was an additional charge in the form of a royalty" on the mix; and that it was ordinary income. Although the Oklahoma case was to the contrary

on this point, it was not cited in the Fourth Circuit's supplemental opinion.

The other two are the Moberg cases. These taxpayers were brothers. One resided in the Fifth Circuit and the other in the Ninth. In the Tax Court their cases were tried together. Judge Black's opinion, 35 T.C. 773 (1961), was reviewed by the full court without dissent. The Mobergs had acquired from McCullough and were co-owners of the Dairy Queen interests for Washington and Oregon. In subcontracting, they used several different agreement forms. The only one which the Tax Court found to result in a sale was one which contained no restrictions whatsoever. That determination was not appealed by the Commissioner. The Tax Court, however, held adversely to the taxpayers as to the other four types of contracts employed. It adhered to its own decision in the Oklahoma case despite the intervening reversal by the Tenth Circuit.

The Fifth Circuit, on Vern H. Moberg's appeal, reversed as to all four contracts. Moberg v. Commissioner, 305 F.2d 800 (5 Cir. 1962). It held, as had the Tenth Circuit majority and the Fourth Circuit, that the restrictions were designed to maintain quality and the like, and were consistent with a sale. It also held that the prohibition against transfer without consent and the provision for termination upon default were no more than conditions subsequent. The lump sum payments were thus held entitled to capital gain treatment. The court felt itself unable to determine from the record whether the gallonage payments were part of the sales price and remanded the case for that determination. The Tax Court, on remand, excluded the gallonage from sales price and again held it to be ordinary income. T.C. Memo. 1963–288, 22 T.C.M. 1483 (1963).

Theodore E. Moberg, the other brother, was not nearly so fortunate. The Ninth Circuit in his case reversed the Tax Court as to only one of the four types of subcontracts, holding, as to it, despite some apparent difficulty because of the imposition of cleanliness standards, that the restrictions were consistent with a sale and were to assure payment of the agreed consideration. Apparently, as to this contract type, the gallonage went along with the lump sum. But on the other three kinds of contract the Ninth Circuit disagreed with the Fifth. It held that the restrictions "were not fixed by contract, but remained to be determined from time to time by the grantors under a continuing power to make policy determinations in these respects. * * * It is a case of reservation by the grantors of a power to exercise continuing, active, operational control in areas which may well affect the success of the grantees' business * * *." Moberg v. Commissioner, 310 F.2d 782, 784 (9 Cir. 1962). The court relied upon its earlier decision in Schmitt v. Commissioner, 271 F.2d 301 (9 Cir. 1959), involving a patent for an accounting method. There the court, pp. 305–306, had described the facts of the Oklahoma case as "strikingly similar" and had observed, "While we might be inclined to favor the reasoning of the dissent in the Dairy Queen case, we need not pass on the facts of that case here, nor overrule it. The facts in the present case are similar, but not identical".

We note the following as to these four cases:

1. Despite the differences in result, no petition for certiorari was filed in any of them.

2. Except for the one wholly unrestricted Moberg contract, the Tax Court has consistently and unanimously denied capital gain treatment in these Dairy Queen situations. It continued to do so subsequent to the appearance of the opposing Tenth Circuit precedent.

3. Although the Tenth Circuit majority and the Fourth and Fifth Circuits agreed that their respective subcontracts effected sales, these courts were not at all in agreement as to the complete tax effect of this conclusion. The Tenth Circuit majority applied the capital gain result to both the store payments and the gallonage. The Fourth Circuit restricted the result to the store payments; it refused to apply it to the gallonage but

gave it ordinary income treatment. The Fifth Circuit remanded to determine if the gallonage constituted part of the sales price. We thus have a three-way approach to the gallonage, with the Fourth and the Tenth Circuits in direct conflict.

4. The Ninth Circuit, on the other hand, drew apart from the others and, except for the one agreement, held that the contracts effected something less than sales. It is thus in positive disagreement with the Fifth and in probable disagreement with the Fourth and with the Tenth Circuit majority even as to the store payments.

It is interesting to contemplate how these four circuits would rule, in the light of their respective precedents, upon the Jester-Dinkins contracts. It would unduly lengthen this opinion to compare all the contracts as to every detail and to recite how they vary, provision by provision. In some respects, and speaking strictly, the contracts imposed greater restraints and, in some respects, lesser ones. We think it probable, however, that, on the form of the contracts alone (apart from the parties' activities and conduct), the Tenth Circuit majority and the Fourth and Fifth Circuits would hold that the lump sum payments are entitled to capital gain treatment; that the Tenth Circuit dissenter and the Ninth Circuit would hold to the contrary; that the Tenth Circuit majority would hold that the gallonage payments are entitled to capital gain treatment; that the Tenth Circuit dissenter and the Fourth and Ninth Circuits would hold otherwise on that feature; and that the Fifth Circuit would have its answer depend on whether those payments were factually part of the sales price. Thus, however we decide, we are bound to be regarded as joining, rather than resolving, any conflict which presently exists among the circuits.

One could say that in these cases the courts appear to be struggling to accommodate, on the one hand, the continuing interest of transferors whose compensation is largely dependent on future profitable use of the transferred rights with, on the other hand, the traditional notion that a seller divests himself of substantially all control over property sold. The difficulty lies in finding a legitimate place to draw the line between the reservation of sufficient rights and restrictions to protect one's continuing financial interest and the reservation of rights to continuing participation in the business on such a scale that it cannot properly be said that there was a sale. Any line will necessarily be drawn arbitrarily. But the line must be drawn somewhere, for tax cases have to be decided, too. Note Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 133 (1965).

We repeat what is already evident from what we have said above, that we do not decide the present case solely on the contracts. We have taken into consideration the activities of Jester and Dinkins in the development of the New Jersey Dairy Queen business. We need not speculate as to what our decision might be if the record before us contained only the cold contracts. Our record contains more than those agreements. It contains the warmth, the enthusiasm and the revealing activity of business enterprise and the continuous application in the market place of the parties' contractual arrangements. In the light of our record, the existence of the opinions of the Tenth Circuit majority and of the Fourth and Fifth Circuits does not persuade us that the capital gain result is to be reached here. We think that the present record presents, in actuality, under both the 1949 and 1951 contracts, something less than a sale. This conclusion may serve to distinguish this case factually from the others. But if this distinction is not one which can be made, we nevertheless adhere to what we described above as our independent analysis apart from the decided cases.

The judgment of the district court is reversed in No. 17,633 and affirmed in No. 17,688, or, expressing our result in another way, the judgment entered for the respective taxpayers is reversed with directions to enter judgment for the United States.