*Decision will be entered under Rule 50.*

RESORTS INTERNATIONAL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 145–68. Filed August 27, 1973.

*John K. Antholis*, for the petitioner.

*Agatha L. Vorsanger* and *Alfred C. Bishop, Jr.*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the income tax of petitioner as follows:

| Year | Deficiency |
| --- | --- |
| 1962 | $44, 885 |
| 1963 | 53, 764 |
| 1964 | 987 |
| 1965 | 25, 288 |

The principal questions involved relate to the characterization of certain transactions whereby the petitioner acquired the stock of various subsidiary corporations which were thereupon liquidated and the businesses thereof taken over by the petitioner. The questions presented as a result of said transactions are:

(1) Whether the net operating loss carryovers of the former subsidiaries of the Victor Paint Co., otherwise available to the petitioner under section 381, are limited by reason of the application of section 382(b) (1) and (2) ; [1] and,

(2) Whether the net operating loss carryovers of the Biff-Burger corporations, otherwise available to the petitioner under section 381, are limited by reason of the application of section 382(b) (1) and (2).

In addition, and unrelated to the foregoing, there is involved the characterization of the gain realized by the petitioner (a) on account of the sale of certain paint stores formerly operated as subsidiaries of Victor Paint Co. and (b) on account of the sale of certain Biff-Burger restaurants formerly operated by the Biff-Burger corporations.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

The petitioner was incorporated under the laws of the State of Delaware in 1958. At the time of its incorporation and at all times material herein, it operated under the corporate name of Mary Carter Paint Co. Petitioner filed its corporate tax returns for the taxable years 1962 to 1965, inclusive, with the district director of internal revenue, Jacksonville, Fla. At the time of the filing of the petition herein, its principal place of business was Tampa, Fla.

Victor Paint Co. was incorporated under the laws of the State of Michigan in 1946. It manufactured and sold paint through retail stores, some of which were separately incorporated. As of December 31, 1961, Victor Paint Co. had 53 of such retail stores, of which 47 were operated as wholly owned subsidiaries. Of the 47 subsidiaries, 33 operated stores in the State of Michigan and 14 operated stores in the State of Ohio.

Victor Building Co. was a corporation organized under the laws of the State of Michigan in January 1962. Its only asset consisted of improved real property located in Detroit, Mich., which was utilized by Victor Paint Co.

During the years involved herein, the business of the petitioner consisted of manufacturing, distributing, and selling paint both through company-owned stores and through independent dealers. The stock of the petitioner was publicly held, and beginning on or before April 9, 1962, was traded on the American Stock Exchange.

As of January 26, 1962, a memorandum of understanding for merger was entered into by the petitioner, Victor Paint Co., and Victor Building Co., pursuant to authority granted by the board of directors of the respective corporations, which set forth the basis upon which petitioner, Victor Paint Co., and Victor Building Co., would effect a statutory merger under the laws of the State of Delaware and of the State of Michigan.

On January 31, 1962, the petitioner, Victor Paint Co., and Victor Building Co., entered into an agreement of merger pursuant to which the latter corporations would be merged into the petitioner, it being the surviving corporation. Said agreement of merger was conditioned, in part, upon obtaining the requisite statutory vote of the stockholders of the corporations parties thereto. Such approval was obtained at meetings of the stockholders of the respective corporations, each held on April 3, 1962.

On April 9, 1962, the agreement of merger was duly filed with the offices of the secretary of state of the States of Delaware and Michigan. Thereupon, the petitioner issued 185,187 shares of its class A com-

mon stock in exchange for all of the shares of Victor Paint Co. and Victor Building Co. Said 185,187 shares represented 10 percent of the fair market value of all outstanding stock of petitioner.

At a meeting of the board of directors of the petitioner, likewise held on April 3, 1962, there was adopted the following resolution:

RESOLVED, That upon the effective date of the Agreement of Merger of Victor Paint Company and Victor Building Co. into Mary Carter Paint Co. the President or any Vice President and the Secretary or any Assistant Secretary of this Corporation be and they hereby are authorized and directed to execute such documents and take such steps, with the advice of counsel for the Corporation, to liquidate and dissolve such of the wholly-owned subsidiaries of Victor Paint Company as the Chairman of the Board of this Corporation in his discretion may deem to be in the best interests of this Corporation.

On or about May 14, 1962, pursuant to the foregoing resolution, the petitioner filed certificates of dissolution dated May 9, 1962, for the 33 Michigan corporations which were formerly subsidiaries of Victor Paint Co. with the secretary of state of the State of Michigan pursuant to section 73, Act 327, Michigan Public Acts of 1931, as amended. The 33 Michigan corporations were thereupon liquidated and dissolved, the assets thereof being acquired by the petitioner as sole stockholder.

At various times between December 21 and December 29, 1962, certificates of dissolution of 10 of the Ohio corporations, which were formerly subsidiaries of Victor Paint Co., were filed with the secretary of state of the State of Ohio pursuant to section 1701.86 of the Ohio Revised Code. The 10 Ohio corporations were thereupon liquidated and dissolved, the assets thereof being acquired by the petitioner as sole stockholder. The other 4 Ohio corporations were maintained in existence as corporate shells in order to avoid any liability on the part of the petitioner on account of long-term leases under which said corporations were lessees.

Prior to the merger between the petitioner and Victor Paint Co., the Internal Revenue Service had completed an examination of the tax returns of Victor Paint Co. and its subsidiaries for the calendar years 1957 and 1958 and for the fiscal years ended November 30, 1959 and 1960. In the course of such examination, the Internal Revenue Service proposed to disallow the surtax exemption claimed by each of said subsidiaries. On October 29, 1962, the proposed disallowance, together with other adjustments resulting from said examination, were disposed of by agreement with the Appellate Division of the Internal Revenue Service.

In the negotiations preceding the agreement of merger with Victor Paint Co., the officers and directors of the petitioner were informed with respect to the fact that operating losses had been or would be incurred by certain subsidiary corporations and that the allowance of the surtax exemption to each of the subsidiaries of Victor Paint Co. had been challenged by the Internal Revenue Service.

On or before April 3, 1962, the representatives of the petitioner who participated in, or were entrusted with, negotiations for the merger with Victor Paint Co. had knowledge of all of the facts upon which there was predicated the decision to dissolve the former subsidiaries of Victor Paint Co. In the case of the Michigan corporations, the decision to proceed with such dissolution on or before May 14, 1962, was attributable to the fact that the State of Michigan imposes a franchise tax on corporations in existence on May 15 of each year. Therefore, the imposition of such tax would be avoided with the filing of certificates of dissolution prior to that date. There were no compelling reasons to expedite the dissolution of the Ohio corporations.

For several years prior to the year 1961, petitioner had conducted its retail sales operations through 15 separately incorporated subsidiaries. At a meeting of petitioner's board of directors held on March 28, 1961, authorization was given to dissolve these subsidiary corporations as soon as possible. The corporations were subsequently in fact dissolved.

On its corporate income tax return for the year ended December 31, 1962, the petitioner claimed a net operating loss deduction on account of net operating loss carryforwards of 26 of the former Michigan subsidiaries of Victor Paint Co. in the aggregate amount of $172,636.47 as follows:

| Corporate name | Year ended Nov. 30, 1961 | Taxable period Dec. 1 to May 14, 1962 (date of liquidation) | Total |
|---|---|---|---|
| Victor Paint East Dearborn Corp | $19,422.34 | $6,943.99 | $26,366.33 |
| Victor Paint Pontiac Corp | | 4,146.15 | 4,146.15 |
| Victor Paint North Woodward Corp | 1,587.82 | 5,042.29 | 6,630.11 |
| Victor Paint Grand River Corp | 2,004.96 | 5,471.58 | 7,476.54 |
| Victor Paint Plymouth Corp | 4,914.74 | 5,108.25 | 10,022.99 |
| Victor Paint Oakland, Inc | | 5,076.69 | 5,076.69 |
| Victor Paint Wayne, Inc | 11,712.59 | 5,911.10 | 17,623.69 |
| Victor Paint East, Inc | 4,951.40 | 3,285.09 | 8,236.49 |
| Victor Paint West, Inc | 6,132.25 | 3,675.25 | 9,807.50 |
| Victor Paint Van Dyke, Inc | 4,323.07 | 4,119.49 | 8,442.56 |
| Victor Paint Mack, Inc | 1,223.95 | 760.64 | 1,984.59 |
| Victor Paint Rouge, Inc | 3,027.05 | 561.90 | 3,588.95 |
| Victor Paint Northfield, Inc | 5,965.95 | 565.70 | 6,531.65 |
| Victor Paint Turney, Inc | 6,985.97 | 5,589.49 | 12,575.46 |
| Victor Paint Fulton, Inc | 2,876.17 | 1,021.37 | 3,897.54 |
| Victor Paint Goldengate, Inc | 5,975.37 | 51.00 | 6,026.37 |
| Victor Paint Shoregate, Inc | 4,182.06 | 51.00 | 4,233.06 |
| Victor Paint Euclid, Inc | 4,739.37 | 51.00 | 4,790.37 |
| Victor Paint Pearl, Inc | 5,320.22 | 51.00 | 5,371.22 |
| Victor Paint Harvard, Inc | 636.73 | 4,592.34 | 5,229.07 |
| Victor Paint Monroe, Inc | 1,107.42 | 3,208.58 | 4,316.00 |
| Victor Paint Broadway, Inc | 844.50 | 3,452.08 | 4,296.58 |
| Victor Paint Starr, Inc | | 941.37 | 941.37 |
| Victor Paint Charles, Inc | | 36.15 | 36.15 |
| Victor Paint Superior, Inc | | 2,225.30 | 2,225.30 |
| Victor Paint Centers, Inc | 2,577.22 | 186.52 | 2,763.74 |
| Total | 100,511.15 | 72,125.32 | 172,636.47 |

In his notice of deficiency for the taxable year 1962, the respondent disallowed $86,318 (or 50 percent) of the net operating loss deduction claimed by the petitioner on account of said subsidiaries, relying on section 382(b)(1) and (2).

Prior to November 9, 1962, Earl P. Brane and Bruce E. Brane owned all of the stock of the following corporations:

National Biff-Burger System, Inc.
B&B Distributing Corp.
Biff-Burger of South St. Petersburg, Inc.
Biff-Burger of St. Petersburg, Inc.
Biff-Burger of Clearwater, Inc.
Biff-Burger of West Tampa, Inc.
Biff-Burger of Tampa, Inc.

These corporations will hereafter be referred to as the Biff-Burger corporations. The Biff-Burger corporations were in the business of selling hamburgers from roadside restaurants.

On October 3, 1962, an agreement of reorganization was entered into by and between petitioner, Earl and Bruce Brane, and the Biff-Burger corporations. Pursuant to this agreement, on November 9, 1962, petitioner acquired all the stock of these corporations solely in exchange for 50,000 shares of its voting class A common stock, representing 1 percent of the fair market value of petitioner's then outstanding stock.

In acquiring the stock of the Biff-Burger corporations, it was the intent of the petitioner to acquire ownership or control over the businesses of each and to grant so-called franchises to individuals who would operate "Biff-Burger" restaurants under a so-called franchise agreement.

On December 20, 1962, the board of directors of each of the Biff-Burger corporations authorized the dissolution and liquidation of each corporation. Pursuant to said authorization, certificates of dissolution were filed with the secretary of state of Florida on February 27, 1963, for all corporations except National Biff-Burger System, Inc. A certificate of dissolution for this corporation was filed on April 3, 1963.

On its corporate income tax return for the year 1963, petitioner deducted $38,346 as a net operating loss carryforward of certain of the Biff-Burger corporations, as follows:

| Corporate name | Feb. 28, Biff-Burger of St. Petersburg, Inc. Dec. 31, Biff-Burger of Clearwater, Inc. | | | | Taxable period ended Dec. 31, 1962 (date of liquidation) | Total |
|---|---|---|---|---|---|---|
| | 1958 | 1959 | 1960 | 1961 | | |
| National Biff-Burger System, Inc | | | | | $10,955 | $10,955 |
| Biff-Burger of St. Petersburg, Inc | $145 | $2,164 | $6,174 | $3,169 | 1,546 | 13,198 |
| Biff-Burger of Clearwater, Inc | 3,097 | 4,935 | 4,348 | 1,145 | 668 | 14,193 |
| Total | 3,242 | 7,099 | 10,522 | 4,314 | 13,169 | 38,346 |

In his notice of deficiency for the taxable year 1963, the respondent disallowed $36,429 (or 95 percent) of the net operating loss deduction

claimed by the petitioner on account of said subsidiaries, relying on section 382(b) (1) and (2).

During the taxable year 1963, the petitioner entered into contracts to transfer to independent dealers certain paint stores in Detroit, Mich., which had been acquired in the merger with Victor Paint Co. The terms and conditions pursuant to which the petitioner transferred each of said stores to the respective dealers were embodied in a set of documents entitled "franchise agreement," "promissory note," and "addendum to franchise agreement." In accordance therewith, the parties agreed, *inter alia*, as follows:

(1) The dealer would enter into a lease of the premises in which the business was operated.

(2) The petitioner would supply its products to the dealer at the same price and upon the same terms at which it sold to all other dealers.

(3) The dealer agreed not to sell below minimum prices established by the petitioner, to use such sales material as were supplied by the petitioner, to participate in the cooperative advertising programs of the petitioner, and to keep its premises clean and neat and in a condition to attract customers. The dealer could not assign any right to use the petitioner's name without the petitioner's consent.

(4) The dealer gave the petitioner a note for the amount of the purchase price payable over a period of 3 years. During this period, the petitioner would add 7 percent to the normal price on all shipments to the dealer, which would be credited against the note. After the note had been paid in full, such addition would be continued until the balance owing for inventory had been paid in full. Upon payment of the purchase price and inventory in full, the dealer would be charged the normal price for shipments.

(5) In the event of default, the dealer would be released from any further liability upon assignment and delivery to the petitioner of the inventory and related products and the assignment of all fixtures and equipment located on the premises.

(6) The term of the agreement was to run for a period of 12 months from the date thereof, renewable automatically from year to year thereafter unless either party gave written notice at least 30 days prior to the expiration of the term. Upon termination thereof, the petitioner would reacquire any inventory from the dealer.

On its corporate income tax return for the taxable year 1963, the petitioner reported a long-term capital gain in the amount of $128,965 attributable to the sale of so-called goodwill as a result of the transfer of the seven Detroit paint stores to the various dealers, computed as follows:

| Dealer and location | Sales price of fixtures | Sales price of inventory | Sales price of goodwill | Total sales price |
|---|---|---|---|---|
| Marshall Abramson and Jack Goyer, 24790 W. Seven Mile Rd., Detroit, Mich. | $1,957.58 | $27,243.97 | $19,204 | $48,405.5 |
| Marshall Abramson and Jack Goyer, 5601 Michigan, Detroit, Mich. | 1,607.63 | 17,775.54 | 18,500 | 37,883.1 |
| Marshall Abramson and Jack Goyer, 24424 W. Michigan, Dearborn, Mich. | 2,835.64 | 35,224.32 | 19,298 | 57,357.9 |
| Clarence Jellerson—Victor Paint—8 Mile, 5330 E. Eight Mile Road, Detroit, Mich. | 1,270.95 | 31,583.89 | 19,502 | 52,356.8 |
| Kenneth Hey, 26350 Eastgate Blvd., Roseville, Mich. | 2,752.09 | 39,411.58 | 18,880 | 61,043.6 |
| Leonard Lyczynski—Victor Paint & Wallpaper Co., 10300 Woodward Avenue, Detroit, Mich. | 908.01 | 19,839.73 | 15,160 | 35,907.74 |
| Leonard Lyczynski—Victor Paint & Wallpaper Co., 11330 Joseph Campau, Hamtramack, Mich. | 2,765.42 | 29,196.27 | 18,421 | 50,382.6 |
| Total | 14,097.32 | 200,275.30 | 128,965 | 343,337.6 |

The sale price of fixtures was equal to the depreciated book value of the fixtures and equipment which was located in each store. This depreciated book value had taken into account the depreciation on the fixtures and equipment to the date of sale.

The sales price of the inventory was determined at dealer's cost, which was equivalent to the prices at which the petitioner would sell such inventory, and any resulting gain was thus reflected as ordinary income.

To the amounts determined above was added an amount which was designated as "goodwill." This amount was determined by making an analysis of sales and profits of each particular store that was being sold. Based on such analysis, an amount was determined which was equivalent to 1 year's net profits for each of the stores being sold and this amount was designated as "goodwill."

In his notice of deficiency for the taxable year 1963, the respondent determined that the gain of $128,965 realized by petitioner from the sale of the seven Detroit paint stores was taxable as ordinary income rather than as a capital gain.

During the taxable years 1964 and 1965, petitioner entered into certain agreements for the transfer of the businesses of eight roadside retaurants acquired in the liquidation of the Biff-Burger corporations pursuant to a so-called franchise agreement, which was similar in all cases. The agreement provided for the following:[2]

(1) The transferee was granted the privilege of operating a "Biff-Burger Porter-Unit Restaurant" within a maximum of 1 or 2 miles of a specified location.[3] This privilege would continue for a period of

---

[2] The agreements were entered into on behalf of the petitioner by National Biff-Burger System, Inc., or National Biff-Burger System, a division of petitioner. For convenience, the contracting party will be referred to as the petitioner.

[3] Except that with respect to Gulfport, Miss., and Jacksonville, Fla., the transferee obtained certain additional rights with respect to the opening of additional Biff-Burgers in either of the two aforenamed cities.

15 years from the date of completion of the installation. This right or privilege could not be transferred without the consent of the petitioner.

(2) The petitioner agreed to assist in the training of the employees of the transferee and in the operation of the restaurant during the initial period after it opened for business, and to provide such other assistance as would aid the transferee in the continued operation of the restaurant, including advertising and promotional materials, recipes, food handling and portion control, recordkeeping, and administration.

(3) Transferee agreed to operate the restaurant during such hours as were recommended by the petitioner and to sell only such items and at such prices as were approved by the petitioner. All supplies used were subject to the petitioner's approval.

(4) The transferee agreed to pay the petitioner a specified percentage of monthly gross sales, and the petitioner reserved the right to check the books and records in order to ascertain the amount due. The transferee could not operate any other roadside restaurant without the consent of the petitioner.

(5) Upon termination of the agreement, the transferee could not own or operate a drive-in restaurant within a 10-mile radius of any Biff-Burger restaurant. The transferee further agreed to discontinue all trade names, signs, or other advertising indicative of the Biff-Burger restaurant and to paint the restaurant so as to distinguish it in form and appearance from other Biff-Burger restaurants.

As part of the agreement, the petitioner executed a "bill of sale and conveyance" pursuant to which the petitioner sold the transferee a "Biff-Burger Porter-Unit and Equipment." The transferee simultaneously executed a "chattel mortgage" securing the payment of the purchase price owing to the petitioner.

Also as a part of the agreement, the petitioner entered into a "sublease" of the business premises pursuant to which the transferee became entitled to all the rights and privileges which the petitioner held as original lessee of the premises and assumed the obligations and duties of the petitioner as such lessee. The terms of the subleases as to rent and duration of occupancy, as compared to the original leases, were as follows:

| Location and sublessee | Term of sublease | Term of main lease | Rent on sublease | Rent on main lease |
|---|---|---|---|---|
| Baton Rouge—William H. Reinhardt | 2/1/64–2/1/69 | 2/1/64–2/1/69 | $365 | [1] $340 |
| Tampa—Bobby P. Smith, et ux | 7/1/63–6/30/66 | 7/1/63–6/30/66 | 300 | 250 |
| Kenneth City—Albani J. Doucet, et ux | 8/10/60–8/9/70 | 3/10/60–3/9/70 | 325 | 325 |
| Warner Robbins—John A. Sweat | 7/1/65–7/14/68 | 7/15/63–7/14/68 | 325 | 300 |
| Fayetteville—O.S.D.B. Inc. | 8/1/65–10/15/67 | 10/15/62–10/15/67 | 170 | 170 |
| Gulfport—Lawrence Mahalak, et ux | 10/1/65–9/30/68 | 9/1/63–9/30/68 | 325 | 300 |
| Jacksonville—Paul F. Dicken | 10/1/65–5/30/68 | 7/1/63–5/30/68 | 350 | 350 |
| Tampa—John W. Barrett, Jr | 7/1/65–3/12/68 | 3/13/63–3/12/68 | 350 | [2] 325 |

[1] Two main leases with same terms and aggregate rental of $340.
[2] Plus 3 percent of gross sales in excess of $130,000.

On its corporate income tax return for the year 1964, the petitioner reported long-term capital gain from the sale of goodwill in the amount of $37,868. This gain was attributed to the sale of three Biff-Burger company-owned and -operated stores located in Baton Rouge, La., St. Petersburg and Tampa, Fla. The amount of $37,868 claimed as a long-term capital gain from the sale of goodwill was determined by subtracting from the total sales price of the three stores which were transferred the adjusted basis of the assets being sold.

On its corporate income tax return for the year 1965, the petitioner reported gain in the amount of $52,684 from the sale of goodwill (other than that reported as gain from installment contracts). This gain realized from the sale of five Biff-Burger company-owned and -operated stores located in Warner Robbins, Ga., Gulfport, Miss., Tampa, Fla., Fayetteville, N.C., and Jacksonville, Fla. The amounts reported on the petitioner's corporate tax returns of $29,285 and $23,399 as long-term capital gains from the sale of goodwill were determined by subtracting from the total sales price of the five stores which were transferred the adjusted basis of the assets being sold.

In his notice of deficiency for the taxable years 1964 and 1965, the respondent determined that the gain of $37,868 and $52,684 realized by the petitioner from the sale of the eight Biff-Burger restaurants was taxable as ordinary income rather than as a capital gain.

## OPINION

### *Operating Loss Carryovers of Victor Paint Co.'s Subsidiaries*

As of April 9, 1962, the petitioner as the surviving corporation in a statutory merger acquired the assets of Victor Paint Co., including the stock of 47 wholly owned subsidiaries of which 33 were incorporated in and operated retail paint stores in the State of Michigan and 14 were incorporated in and operated retail paint stores in the State of Ohio. On May 14, 1962, petitioner caused to be liquidated and dissolved the 33 Michigan subsidiaries.

The Federal income tax returns of Victor Paint Co., and its subsidiaries were filed on the basis of a fiscal year ended November 30. For the fiscal year ended November 30, 1961, and the taxable period ended May 14, 1962, net operating losses were sustained by certain of the Michigan subsidiaries in the amounts of $100,511.15 and $72,125.32, making an aggregate net operating loss carryforward of $172,636.47. In its Federal income tax return for the taxable year 1962, the petitioner claimed a net operating loss deduction in the full amount of $172,636.47. The respondent proposes to disallow 50 percent of the amount claimed.

The petitioner contends that the merger of Victor Paint Co. with the petitioner and the subsequent liquidation of the former Michigan subsidiaries of Victor Paint Co. should be treated for tax purposes as separate transactions. Accordingly, the petitioner argues that the liquidation of the subsidiaries qualifies as a distribution to which section 332 applies thereby entitling the petitioner to the full amount of the net operating loss deduction under section 381(a)(1).

The respondent contends that the merger of Victor Paint Co. and the petitioner and the subsequent liquidation of the Michigan subsidiaries of Victor Paint Co. should be considered together. Thus considered, the respondent contends that the transaction constituted a reorganization between the petitioner and Victor Paint Co. as defined in section 368(a)(1)(A), together with simultaneous reorganization between petitioner and each of the dissolved subsidiaries as defined in section 368(a)(1)(C). On that basis, respondent argues that section 381(a)(2) applies, thereby limiting the amount of the deduction in accordance with section 382(b)(1) and (2).

Section 382(b)(1) provides that where one corporation acquires the business of another corporation pursuant to a reorganization as specified in section 381(a)(2), and the transferor corporation has a net operating loss which is carried over to the first taxable year of the acquiring corporation ending after the transfer, the amount thereof must be reduced proportionately as provided in section 382(b)(2) if the stockholders of the transferor corporation own less than 20 percent of the fair market value of the outstanding stock of the acquiring corporation. If section 382(b)(1) applies, the parties agree that the formula provided for in section 382(b)(2) would result in a reduction of 50 percent of the net operating loss carryover available to petitioner on account of the net operating losses of the Victor subsidiaries.

With respect to this issue the sole question for decision is whether the transactions pursuant to which petitioner acquired the assets of the Michigan subsidiaries constituted liquidations under section 332 as specified in section 381(a)(1) or whether such transactions constituted transfers in connection with a reorganization as specified in section 381(a)(2). Section 381(a) provides as follows:

SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2) ; or

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

With respect to the application of section 381(a)(1) and (2), respondent's regulations further provide:

Sec. 1.382(b)-1 Change of ownership as the result of a reorganization.
(a) *In general.* * * *

\*     \*     \*     \*     \*     \*     \*

(6) Section 382(b) applies only with respect to those reorganizations described in section 381(a)(2). However, a series of transactions which purport to be a reorganization qualifying under section 368(a)(1)(B) followed by a liquidation qualifying under section 332, but which in substance comprise a reorganization qualifying under section 368(a)(1)(C), will be considered as a reorganization of the last-described type for purposes of section 382(b) and this section.

Although the transaction referred to in the regulation is cast in the form of a reorganization under section 368(a)(1)(B) followed by a liquidation under section 332, the principle would be the same where the initial transaction was cast in the form of a reorganization under section 368(a)(1)(A). No basis exists for treating the second step any differently.

In an effort to avoid the impact of the regulation, the petitioner sought to show that the liquidation of the Michigan subsidiaries was "an afterthought." The petitioner presented evidence to show that the resolution of the board of directors of the petitioner authorizing the liquidation of the subsidiaries, although made a part of the minutes of the meeting of April 3, 1962, at which time the merger was also approved, were written up subsequent to the merger and inserted in the minutes of that date as a matter of convenience.

As a general rule, under Delaware law parol evidence is inadmissible to limit, vary, or contradict the corporate books and records in the absence of omission, error, or fraud. *Saulsbury* v. *American Vulcanized Fibre Co.*, 91 Atl. 536 (Del. Super. Ct. 1914), affirmed per curiam 95 Atl. 1078 (1915); 5 Fletcher, Cyclopedia Corporations sec. 2198 (1967). While exceptions to that rule have been recognized, it is doubtful whether the evidence offered by the petitioner would come within those exceptions. See *Bennett* v. *Propp*, 187 A. 2d 405 (Del. 1962); *Cheff* v. *Mathes*, 199 A. 2d 548 (Del. 1964); *Schroder* v. *Scotten, Dillon Co.*, 299 A. 2d 431 (Del. Ch. 1972).

Nevertheless, even if we accept petitioner's proof that the resolution to liquidate the subsidiaries was not, in fact, adopted at the precise date that the resolution appears in the minute book, it does not follow that the merger of Victor Paint Co. and subsequent liquidation of its subsidiaries should be treated as separate and unrelated transactions. The real question is whether there was at any time an intent on the part of either the management or the board of directors of petitioner to con-

tinue the operation of the paint stores acquired from Victor Paint Co. as subsidiary corporations. The record as a whole negatives such intent.

The facts which formed a basis for the decision to liquidate the Michigan subsidiaries were known to petitioner's representatives prior to the merger. Under similar conditions, other subsidiaries had been dissolved by the petitioner in prior years, and subseqent acquisitions were likewise dissolved. With competent advice both from its attorneys and its independent accountants, it is unrealistic to argue that petitioner's planning was on a "day-to-day basis." The decision to liquidate was not something "unexpected," but rather an action that either was or should have been foreseen.

Whether the lapse of time between the merger and the subsequent liquidation is about 1 month in the case of the Michigan subsidiaries or slightly less than 9 months as in the case of the Ohio subsidiaries, thus proves nothing.[4] The timing of the liquidations was clearly a matter of administrative convenience. While the timing of the liquidation of the Michigan subsidiaries may have been motivated by a desire to avoid the imposition of the Michigan franchise tax, the decision to liquidate was not. It is clear that the liquidations of both the Michigan and Ohio subsidiaries were part of a continuing series of transactions starting with the merger.

No useful purpose would be served by a review of the cases relied on by the respondent. E.g., *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609 (1938) ; *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942) ; *The South Bay Corporation* v. *Commissioner*, 345 F. 2d 698 (C.A. 2, 1965) ; *Commissioner* v. *Ashland Oil & R. Co.*, 99 F. 2d 588 (C.A. 6, 1938) ; *Warner Co.*, 26 B.T.A. 1225 (1932). Nor do we view as applicable the cases cited by the petitioner wherein upon the basis of differing factual situations, it was held that various transactions which might have followed each other closely in point of time should be considered separately. E.g., *Bruce* v. *Helvering*, 76 F. 2d 442 (C.A.D.C. 1935) ; *Charles R. Mathis, Jr.*, 19 T.C. 1123 (1953) ; *George Whittell & Co.*, 34 B.T.A. 1070 (1936). The failure to consider the ultimate result in the case before the Court would be wholly incompatible not only with the above-quoted regulations but with the congressional intent in enacting section 381 and section 382.

Section 381 and section 382 were enacted in the law as part of the Internal Revenue Code of 1954. The limitation in question was added to the House bill by the Finance Committee of the Senate. In explanation, that committee said : [5]

---

[4] It will be noted that the Congress has allowed a period of 2 years from the acquisition of the stock for a liquidation to qualify under sec. 334(b).

[5] S. Rept. No. 1622, 83d Cong.. 2d Sess., pp. 284–286 (1954).

Section 382. *Special limitations on net operating loss carryovers*

Your committee has retained this section of the House bill but has made some changes and additions. The section in the House bill provided generally that if 50 percent or more of a corporation's stock changed hands during a 2-year period as the result of a purchase or redemption of stock, the net operating loss carryovers of such corporation would be reduced by the percentage of the change of ownership. The section now provides, generally, that if 50 percent or more of a corporation's stock changes ownership during a 2-year period as the result of a purchase or redemption of stock, and if the corporation changes its trade or business, then any net operating loss carryovers will be entirely eliminated. In addition, the section contains a new limitation on net operating loss carryovers in those corporate reorganizations described in section 381. This provision reduces the net operating loss carryovers of either the transferor or acquiring corporation unless there is a 20 percent or more continuity of interest in the resulting corporation retained by the stockholders of the corporation with the net operating loss carryovers.

\*    \*    \*    \*    \*    \*    \*

Subsection (b) is designed to prevent the liberalized carryover of net operating losses permitted in section 381 from being used by one corporation to acquire the total net operating loss carryovers of another corporation without giving up at least a 20 percent share to the stockholders of the corporation with the net operating loss carryover. If the stockholders of the loss corporation have a 20 percent or more interest in the successor corporation, it is felt there is sufficient continuity of interest in the net operating loss carryover to justify permitting the entire net operating loss to carry over. If, however, the stockholders of the loss corporation receive less than a 20 percent interest in the successor corporation, the net operating loss carryover is reduced as provided in paragraph (2). The 20 percent continuity of interest requirement is intended to apply to the corporation which includes the net operating loss carryover in its net operating loss deduction. Thus, the 20 percent requirement cannot be watered down by inserting one or more corporate entities between the corporation with the loss and the corporation deducting the loss.

It is agreed that under the "continuity of interest test" prescribed in section 382(b)(1) and (2) the petitioner as the acquiring corporation would be limited to 50 percent of the net operating loss carryover of Victor Paint Co., the acquired corporation. Simple logic would require extending that limitation to losses sustained by the former subsidiaries of Victor Paint Co., the stock of which was acquired in the same transaction.

### *Operating Loss Carryovers of Biff-Burger Corporations*

On November 9, 1962, petitioner acquired all of the stock of seven corporations referred to as the "Biff-Burger corporations" from Earl and Bruce Brane in exchange for 50,000 shares of petitioner's common stock, representing 1 percent of the fair market value of its then outstanding stock. On December 20, 1962, the respective board of directors authorized the dissolution and liquidation of each of the Biff-Burger corporations. With one exception, certificates of dissolution were filed on February 27, 1963. For the year 1963, petitioner deducted $38,346 as a net operating loss carryforward of certain of the Biff-Burger

corporations. Under the continuity-of-interest test prescribed in section 382(b) (1) and (2), the respondent limited the deduction to 5 percent of the agreed losses incurred by the Biff-Burger corporations prior to the liquidation.

While the initial acquisition of the stock of the Biff-Burger corporations differed from the transaction involving the Victor Paint Co., the question is substantially the same. The petitioner contends that the stock of the Biff-Burger corporations was acquired pursuant to a reorganization as defined in section 368(a) (1) (B) followed by a liquidation of the acquired corporations pursuant to section 332. On the other hand, the respondent argues that the transaction should be treated the same as if petitioner had issued its stock in exchange for the assets of the Biff-Burger corporations. The respondent's position is squarely within the above-quoted regulation.

With respect to the facts, it is clear that notwithstanding the lapse of time from the acquisition by petitioner of the stock of the Biff-Burger corporation, the liquidation of those corporations having restaurants was essential to the overall plan of the petitioner. The petitioner's stated intention in acquiring the Biff-Burger corporations was to establish a so-called franchising business whereby the operation of the various Biff-Burger restaurants would be transferred under a "franchise agreement" to independent operators. Such a plan would seem to require a single licensing or franchising corporation, whether that be the petitioner directly or a subsidiary organized or maintained for that specific purpose. It would make no sense to have a separate franchising corporation for each location. Accordingly, for the reasons stated with respect to the liquidation of the subsidiaries of Victor Paint Co., the position of the respondent with respect to the liquidation of the Biff-Burger corporations must also be sustained.

### Sale of Victor Paint Stores

During the taxable year 1963, the petitioner transferred the operation of certain company-owned Victor Paint stores to independent operators. The transfers included fixtures, inventories, the right to the leaseholds, and the right to use the name "Victor Paint." The agreement ran for a term of 1 year and was automatically renewed thereafter from year to year unless either party gave 30 days' notice. Upon the termination of the agreement, there were the customary provisions governing the "buy back" of inventory and the like. As a result of such transfers, petitioner realized a gain of $128,965, which petitioner reported as a long-term capital gain.

The respondent contends that the gain realized from the sale of the Victor Paint stores should be taxable as ordinary income on the theory (1) that the right to operate the Victor Paint stores was property held primarily for sale to customers in the ordinary course of

petitioner's business under section 1221(1) and (2) that the transfers were mere licensing agreements as distinguished from the sale of a "franchise."

The agreements pursuant to which the petitioner transferred the Victor Paint stores, to independent operators could hardly be considered the sale of a "franchise" as that term is commonly understood by the courts. For example, see *United States* v. *Wernentin*, 354 F. 2d 757 (C.A. 8, 1965); *Moberg* v. *Commissioner*, 310 F. 2d 782 (C.A. 9, 1962); *Gowdey's Estate* v. *Commissioner*, 307 F. 2d 816 (C.A. 4, 1962); *Moberg* v. *Commissioner*, 305 F. 2d 800 (C.A. 5, 1962); *Dairy Queen of Oklahoma* v. *Commissioner*, 250 F. 2d 503 (C.A. 10, 1957). The agreements were similar in form to the ordinary year-to-year agreements entered into between manufacturers and their distributors or dealers. The only right obtained by the transferee not otherwise freely available in the market place was the right to use the trade name "Victor Paint." That right necessarily went along with the sale of the products. The various stores had been operated as separately incorporated businesses by Victor Paint Co. The transfer of such businesses to independent operators was nothing more than the sale of a going business.

The petitioner had chosen to characterize the gain as being attributable to "goodwill." The respondent does not dispute the allocation of the sales price to the inventory and fixtures. The balance must necessarily have been attributable to the "going business," that is "goodwill." Accordingly, the petitioner is entitled to report a sum of $128,965 as a long-term capital gain.

## Sale of Biff-Burger Restaurants

During the taxable years 1964 and 1965, the petitioner transferred the operation of the restaurants previously acquired in the liquidation of the Biff-Burger corporations to independent operators. Pursuant to such transfers, the transferee was granted the privilege to operate a Biff-Burger restaurant within a specified area for a period of 15 years. Petitioner was obligated to assist the transferee in such operation. Petitioner also exercised control over both the hours of operation and the products sold. The transferee further agreed to pay to the petitioner a specified percentage of gross sales. As a part of the agreement, the petitioner leased the business premises to the transferees for a specified monthly rental which in some cases was the same amount as the rental for which the petitioner was obligated and in other cases was at a higher rental.

As a result of such transfers, petitioner realized a gain in the amount of $37,868 for the taxable year 1964 and a gain in the amount of $52,684 for the taxable year 1965, which the petitioner reported as long-term capital gains. The respondent contends that the gain real-

ized from the sale of the Biff-Burger restaurants should be taxed as ordinary income.

With respect to this issue, the weakness of the petitioner's position is twofold. First, it is clear from the record that the petitioner acquired the stock of the Biff-Burger corporations with the intention of selling the right to operate Biff-Burger restaurants as a part of its trade or business. Secondly, although the petitioner may have acquired a "going business" in the liquidation of the Biff-Burger corporations, it does not appear that the petitioner sold that business to the transferees. In fact, it is doubtful if the agreement would qualify as a sale of a proprietary right or "franchise" which some of the courts have looked upon as a capital asset. (See cases cited at p. 793.)

All that petitioner did was to license the transferee to use the Biff-Burger name in the operation of a roadside restaurant in a specific area under the supervision and control of the petitioner. In exchange for this right, the petitioner exacted a substantial "down payment," together with a share in the gross receipts from such sales. The resulting gain is taxable as ordinary income. (For a discussion of the *Dairy Queen* cases, see *United States* v. *Wernentin*, *supra.*)

*Decision will be entered under Rule 50.*

