**ESTATE of G. R. GOWDEY, Deceased, and Verna E. Gowdey, Executrix and Surviving Spouse, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

No. 8495.

United States Court of Appeals
Fourth Circuit.

Argued March 20, 1962.

Decided June 25, 1962.

Petition for Clarification Denied in Supplemental Opinion
Sept. 6, 1962.

Robert Ash, Washington, D. C. (Ash, Bauersfeld & Burton, Washington, D. C., on the brief), for petitioners.

Arthur E. Strout, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, on the brief), for respondent.

Before SOBELOFF, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Capital gain or ordinary income [*] is the question arising here in classifying for taxation moneys received by the petitioner-taxpayers in these circumstances:

After a machine for freezing and dispensing a dairy product was patented, the "exclusive right and license to the use, manufacture, sale and distribution of all machines built under [the] patent" were acquired by one McCullough. The grant was limited to named States, including Virginia. The privilege was also given of awarding sublicenses "for territorial rights". Grantee McCullough was to supply the secret-formula "mix" used in the machines in the making of the product. He would also make and own the machines, and provide them to his sublicensees. McCullough agreed to pay the patent owner 4 cents per gallon on all mix put through the machines, which obligation was to continue so long as the machines were used despite earlier expiration of the patent. "Dairy Queen", the name McCullough gave to the frozen product, was registered by him as a trade name in Virginia under 1919 Code of Virginia §§ 1455 et seq., as amended.

Thereafter taxpayer G. R. Gowdey in a written agreement obtained from McCullough in perpetuity and exclusively "the rights to the use of [such] machines" as should be needed by Gowdey for a distributorship in Virginia, together with the privilege of using the trademark "Dairy Queen" in connection with the machines. All machines had to be ordered through McCullough, though at manufacturer's cost, and Gowdey was pledged not to move any machine beyond Virginia for the purpose of operating it.

While Gowdey could not assign this agreement, the express right to subcontract the machines to other persons within Virginia was granted him. Each such subcontractor, however, was to be bound by the McCullough-Gowdey agreement. Neither Gowdey nor his subcontractor could sell any other frozen dairy product, use any other type of machine, or sell any of the machines without the consent of McCullough first obtained.

For these rights Gowdey paid McCullough $40,000. Additionally, Gowdey promised to pay the patent owner 4 cents for each gallon of mix used or sold in Virginia, irrespective of the expiration of the patent.

Gowdey, vested with this agreement, entered into 14 "Dairy Queen Franchise Agreements", each specifying a definite, exclusive and separate territory within Virginia. All of them stipulated that Gowdey should furnish to the designated "Licensee" one or more machines— "Dairy Queen Freezers"—which would be used by the Licensee but remain the property of Gowdey. The agreement imposed certain restrictions upon the use of the privileges transferred. Every Licensee was obliged to purchase mix only from a source named and approved by Gowdey.

---

[*] Internal Revenue Code of 1939:

"§ 22. Gross income

"(a) General Definition. 'Gross Income' includes gains * * * from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; * * *."

(26 U.S.C.A. § 22, 1952 ed.)

"§ 117. Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

\* \* \* \* \*

"(b) Deduction from gross income. In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * * *"

(26 U.S.C.A. § 117, 1952 ed.)

Each Licensee paid Gowdey an immediate sum upon the execution of the agreement and thereafter 35 cents per gallon on all mix used or sold within his territory. Under these Franchises Gowdey received in 1949 $12,000 in immediate payments and $5588.10 in gallonage. In 1950 these items amounted to $44,000 and $30,693.90 respectively. For both years the taxpayer reported the gallonage as ordinary income but treated the immediate receipts as capital gain subject to reduction for the original cost of the Virginia Franchise. The Commissioner of Internal Revenue approved the gallonage treatment, but determined that the initial payments were also ordinary income and assessed a deficiency accordingly. In the judgment before us, entered on the petition of Gowdey's personal representatives for redetermination, the Tax Court agreed with the Commissioner.

The transactions between Gowdey and his Licensees, the petitioners here allege, were sales. The subject of each sale, they continue, was a single composite group of rights exercisable in perpetuity in a specified Virginia territory, and composed of three ingredients: (1) the exclusive right to the use of the machine or machines; (2) the exclusive right to the use of the name Dairy Queen; and (3) the exclusive right to prepare, sell and distribute the secret-mix frozen product, Dairy Queen. The profits under these arrangements, they conclude, were capital gains.

Contra, the Tax Court found, as the Commissioner contended, the agreements not to constitute sales but mere licenses. All moneys received under the Franchise Agreements were, therefore, royalties, taxable as ordinary income rather than capital gain. For this position the Commissioner argued that the absolute ownership of Gowdey in the rights he held from McCullough—whatever their nature—was so constricted and circumscribed in his subcontracts, that what he conveyed therein to his Licensees amounted to no more than a license.

There is a scarcity of precedent upon the point of the legal stature of such franchises. For assistance in the resolution of the issues here we must first go to resemblant instruments. The principles governing transfers of rights of use have been generally enunciated in litigation of patents, copyrights, secret processes and insurance agency contracts. While the privileges in suit are neither patent rights nor one of the other classes, all involve intangibles and have additional common qualities. While far from perfect analogues and not completely controlling, the other instances are helpful in our determination of the status of the Franchise Agreement, and the efficacy of its purport of sale. Merck & Co. v. Smith, 261 F.2d 162, 165 (3 Cir. 1958).

Upon consideration of these parallels and the few direct decisions, we think the Tax Court erred in confirming the Commissioner. The transaction, in our opinion, had every essential characteristic of a sale. It does not pretend to be a sale of the machine, the trademark or the mix-product, but rather a sale of their use. In truth the patent is a very remote and insignificant part of the subject of the transfer. Such "privileges" (as they are described in the Franchise Agreement) are property susceptible of sale. The contract conferring them would have substantial value since its owner could employ it to produce income; it was enforceable at law and carried the power perpetually to exclude the grantor and all others from the same rights within the designated territory. Jones v. Corbyn, 186 F.2d 450, 452 (10 Cir. 1950). See E. I. Dupont De Nemours & Co. v. United States, 288 F.2d 904, 911 and 912 (Ct.Cl. 1961). Moreover, no statutory limitation, such as is impressed upon a patent, is put upon the duration of the use granted in the machines, the secret mix or the trademark.

The principle determinative here is that to be a sale the transaction must vest the transferee with "all of the substantial rights" in the personalty (here the privileges). See Merck & Co. v.

Smith, supra, 261 F.2d 162, 164. It must vest the transferee with a title that might be fairly comparable, in degree, to what would be a fee in an easement in land. Wilson Bros. v. Branham, 131 Va. 364, 109 S.E. 189, 192 (1921). In personal property, however intangible, it would be termed an absolute estate. See Goin v. Absher, 189 Va. 372, 53 S.E. 2d 50, 53 (1949). Presently, if less than such an ownership was invested in the purchaser by the Franchise Agreement —any substantial right withheld—then it was not a *sale* of the privileges. Arnold v. North American Chemical Co., 232 Mass. 196, at 199, 122 N.E. 283 (1919) which states at 284:

> "The word [sale] implies ordinarily the passing from seller to buyer of the general and absolute title to property as distinguished from a special interest, a bailment, a license, a lease, a pawn or other limited right, falling short of complete ownership."

See also Gershwin v. United States, 153 F.Supp. 477, 478, 139 Ct.Cl. 722 (Ct.Cl. 1957), opinion by Whitaker, J. The Franchise Agreements, we believe, carried a general, absolute and perpetual proprietorship in the privileges to the licensees.

Again as in realty, reasonable restrictions could be placed upon the privileges sold without destroying the absolute character of their transfer. See Cowell v. Colorado Springs Co., 100 U.S. 55, 57, 25 L.Ed. 547 (1879); Hutchinson v. Maxwell, 100 Va. 169, 175, 40 S.E. 655, 657, 57 L.R.A. 384 (1902). Cf. Ribble, 1 Minor on Real Property 723 (2d. ed. 1928). To constitute a sale here, the privileges must have been transferred unreservedly and without material reduction, since undue limitation would water the transaction down to a license. See Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 36, 43 S.Ct. 254, 67 L.Ed. 516 (1923); Kirby v. United States, 297 F. 2d 466, 468 (5 Cir. 1961); Schmitt v. Comm'r, 271 F.2d 301, 308 (9 Cir. 1959).

Cf. E. I. DuPont De Nemours & Co. v. United States, supra.

We conclude that the restrictions embodied in the Franchise Agreement are necessary to protect the machine, product and name elsewhere; that they are consistent with the absolute right to the use of the machines and the method of payment for the Franchise; and that they do not effect a retention by the transferor of any substantial right in the privileges assigned. Certainly that is true of these stipulations: the declaration that the freezer shall remain personalty; the requirement that the subcontractor install it at his expense and maintain it in "good operating condition and repair"; the stipulation that the subcontractor must "furnish a suitable location (for the machine) with a building erected or used * * * similar in construction and appearance to standard 'Dairy Queen' stores", and maintain the standard with respect to cleanliness and sanitation set by Gowdey; provisions that a record was to be maintained of all *mix sold*, and that the subcontractor would "dispense no product from said machines or store other than 'Dairy Queen' frozen food"; and finally, the authorization for Gowdey to recover the machines for any breach of the contract.

A more difficult question is posed, however, by the remaining covenant, Section 12 of the contract, which limits alienation: "this contract shall not be transferred or assigned without the prior permission of [the Licensor]". It has been argued that withholding of the *jus disponendi* precludes the creation of an absolute estate, since without it usually no sale is constituted.

The absence of an absolute right of disposal has been held not to preclude a sale. For example, a recapture clause in the event of Bankruptcy has been ruled insufficient to prevent the sale of a patent. Merck & Co. v. Smith, supra, 261 F.2d at 164. Similarly, in Allen v. Werner, 190 F.2d 840, 842 (5 Cir. 1951) the prohibition of an assignment of a right of use save in a transfer with the

vendee's entire business was said not to defeat a sale. Rollman v. Comm'r., 244 F.2d 634 (4 Cir. 1957) declares, at 639

"The authorities do not support the view that the grant of exclusive rights under a patent does not amount to a transfer of a capital asset if the assignee cannot grant a sublicense without the assignor's consent."

The Court continues, "[the limitation] serves to protect both parties * * * in case the purchase price is paid in instalments. * * *" See Walen v. United States, 273 F.2d 599, 601 (1 Cir. 1959); Watson v. United States, 222 F. 2d 689, 691 (10 Cir. 1955). Inasmuch as the patent is so distantly related to the instant privileges, of course, the omission from the Franchise Agreement of the indispensable features of a sale of a patent—the right to make, use and vend—would not vitiate it as a "sale" under the rule of Waterman v. Mackenzie, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891).

A predominant factor in our determination—that the Franchise Agreement accomplished a sale—is that the privileges were transferred in perpetuity. An obvious indicium of an absolute estate, it would be paradoxical in a lease or license. Of course, to trace too nice distinctions of estate would be to engage in "refinements of title" and we are taught they have no place in taxation. Griffiths v. Comm'r., 308 U.S. 355, 357, 60 S.Ct. 277, 84 L.Ed. 319 (1939); Wodehouse v. Comm'r., 166 F.2d 986, 990 (4 Cir. 1948) rev'd on other grounds, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419 (1949). But we are persuaded further by the broad view of the practical aspects of the problem related in the opinion and decision of the Tenth Circuit in Dairy Queen of Oklahoma v. Comm'r., 250 F.2d 503 (10 Cir. 1957).

The upshot of our study is that the lump-sum payments to the taxpayer in 1949 and 1950 should be assessed as receipts from the sale of capital assets. This determination generates the further question—not reached by the Tax Court—whether the cost to the taxpayer of the State Franchise, or any part of it, is deductible from subfranchise receipts in ascertaining the taxable gain. The judgment of the Tax Court is set aside, and we remand the case there for decision of that question.

Reversed and remanded.

## SUPPLEMENTAL OPINION

The taxpayer requests us in a "Petition for Clarification of Opinion" to supplement our opinion so as to show that the gallonage payments are taxable as long-term capital gain. We did not so hold or intend to do so. We reversed the Tax Court only insofar as it held the lump-sum receipts to be ordinary income and we adhere to this conclusion.

The down payment under each Franchise Agreement was in satisfaction of the sale to the franchisee of the three privileges sold to him:

"* * * [T]he exclusive rights to the use of the Freezing and Dispensing Machines, and the Trade Mark 'Dairy Queen', together with the right to prepare, sell and distribute the frozen product known as 'Dairy Queen' * * *."

The 35 cents per gallon was an additional charge in the form of a royalty on the "mix used or sold". The mix itself was not a part of the sale by Gowdey to the franchisee, and the gallonage payments were not a part of the consideration for the sale of the privileges.

This obviously was the view of the taxpayer, for he returned these receipts as ordinary income. The Commissioner agreed as did the Tax Court. But it is true, as the petition for clarification avers, this proceeding does include a claim by the taxpayer that the gallonage money is to be recognized only as capital in nature. However, to repeat, we found no merit in this contention.

Petition for Clarification of Opinion denied.