**RESORTS INTERNATIONAL, INC.,**
**Petitioner-Appellant-Cross-Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee-Cross-Appellant.**

No. 74–1955.

United States Court of Appeals, Fifth Circuit.

April 14, 1975.

John K. Antholis, New York City, for petitioner-appellant-cross-appellee.

Scott P. Crampton, Asst. Atty. Gen., Dept. of Justice, Tax Div., Meade Whitaker, Chief Counsel, I.R.S., Gilbert E. Andrews, Acting Chief, Appellate Sec., Richard Farber, Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee-cross-appellant.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges:

TUTTLE, Circuit Judge.

This tax case involves four separate sets of transactions entered into by the taxpayer, Resorts International, during the tax years 1962 through 1965. The Commissioner assessed deficiencies totalling $124,924 for these years, in response to which the taxpayer filed a petition in the Tax Court for a redetermination of the deficiency. The Tax Court upheld three of the four deficiencies assessed by the Commissioner. 60 T.C. 778. The taxpayer filed this appeal, and the Commissioner cross-appealed. In our view, the Commissioner was correct as to all four deficiencies, and accordingly we affirm in part and reverse in part.

## I.

### FACTS

The taxpayer is a Delaware corporation which, during the years in question, was engaged primarily in the business of manufacturing, distributing, and selling paint through company-owned stores and independent dealers.[1] The transactions which gave rise to the four tax issues involved in this case can be briefly summarized:

### 1. Acquisition and Liquidation of Victor Paint Company's Subsidiaries.

Victor Paint Company was a Michigan corporation which manufactured and sold paint through retail stores. At the time of its statutory merger with the taxpayer in April, 1962, it operated 47 wholly-owned subsidiaries. In May and December following the merger the taxpayer liquidated 43 of these subsidiaries. On its corporate income tax return for 1962 the taxpayer claimed a net operating loss deduction for the loss carryforwards of 26 of these former subsidiaries of Victor Paint, in the aggregate amount of $172,636.47. The Commissioner disallowed 50% of the claimed net operating loss deductions. The Tax Court sustained the Commissioner's action.

### 2. Acquisition and Liquidation of Seven Biff-Burger Corporations.

In October 1962 the taxpayer entered into agreements of reorganization with the sole stockholders of 7 corporations which were in the business of selling hamburgers from roadside restaurants. Pursuant to these reorganization agreements the taxpayer acquired the stock of these 7 corporations solely in exchange for 50,000 of its common shares. The following year these 7 corporations were

---

1. During the tax years in question the taxpayer operated under the corporate name "Mary Carter Paint Co." The corporate name was changed to "Resorts International, Inc." in 1968.

liquidated, and on its corporate income tax return for 1963 the taxpayer deducted net operating loss carryforward attributable to certain of these corporations in the aggregate amount of $38,-346. The Commissioner disallowed 95% of the claimed net operating loss deduction, and the Tax Court sustained his determination.

### 3. Transfer of Biff-Burger Restaurants.

During 1964 and 1965 the taxpayer entered into 8 separate agreements, styled by the parties "franchise agreements," by which the taxpayer transferred the privilege of operating Biff-Burger Restaurants within certain specified locations. The transfer agreements gave the right to operate the restaurant in question for a period of 15 years from the date of completion of the facility to the transferee, but included restrictions on the transferee's rights to operate the business as it chose.[2] On its corporate income tax return for 1964 the taxpayer reported long-term capital gains of $37,-868 from the sale of 3 of these Biff-Burger company-owned stores, and on its return for 1965 reported long-term capital gain of $52,684 from the sale of the remaining 5. The Commissioner determined that the gain realized in 1964 and 1965 on the transfer of the 8 Biff-Burger Restaurants was taxable as ordinary income rather than as a capital gain. The Commissioner's assessment was based on the grounds that the transfers were licensing arrangements rather than sales of franchises, or in the alternative that the franchises were held by the taxpayer primarily for sale in its ordinary course of business and thus did not constitute a capital asset. The Tax Court sustained

the Commissioner's determination, holding that the transfers of the restaurants constituted mere licensing arrangements, and further holding that the franchises were held "primarily for sale."

### 4. Transfers of the Victor Paint Stores.

During 1963 the taxpayer entered into contracts to transfer to independent dealers the right to operate certain paint stores in Detroit, Michigan which had been acquired in the merger with Victor Paint Company. The terms of the agreements provided that the agreements were for twelve months, renewable automatically from year to year thereafter unless either party gave notice it wished to terminate the agreements. In addition the agreements provided for certain limitations on the ability of the dealer to operate the business as he chose.[3] On its corporate income tax return for 1963 the taxpayer reported long-term capital gain of $128,765 from the transfer of these 7 paint stores. The Commissioner determined that the gain realized was taxable as ordinary income again on the alternative grounds that the transfers either constituted mere licensing arrangements rather than sales of franchises, or that the stores were held by the taxpayer primarily for sale in its ordinary course of business. The Tax Court overruled the Commissioner's determination, holding that the transfers were sales of going businesses. The Court however failed to address the Commissioner's alternative contention that the stores were held "primarily for sale."

Thus, while 4 separate transactions are involved in the case, 2 distinct tax issues are raised in the appeal and cross-appeal.

2. The right to operate a Biff-Burger Restaurant could not be transferred; the taxpayer agreed to actively assist in the training of the transferee's employees and provide other managerial assistance; the transferee agreed to operate the restaurant during certain times, as the taxpayer might "recommend," and to sell certain objects at such prices as the taxpayer might approve. The transferee agreed to pay the taxpayer a percentage of monthly gross sales, and the taxpayer reserved the right to audit the transferee's books.

3. The dealer could not assign the right to use the taxpayer's name without its consent. The dealer agreed to lease the premises at which the stores were operated and to accept paint from the taxpayer at the price and on the same term at which the taxpayer sold to all other dealers. The dealer agreed to sell at certain minimum prices, to use the sales materials offered by the taxpayer, and to participate in cooperative advertising and to maintain the premises.

## II.

### OPERATING LOSS CARRY-FORWARDS

■ §§ 332 and 381(a) of the Internal Revenue Code of 1954 permit a corporation to liquidate a wholly-owned subsidiary and take into account its operating loss carryovers. The extent to which a corporation may use the loss carryovers of a liquidated subsidiary may be limited by § 382(b) if the liquidation occurs as part of the § 368(a)(1) tax-free plan of reorganization through which the corporation acquired the shares of the liquidated subsidiary. The amount of loss which can be carried forward by the parent is reduced by a formula contained in § 382(b) if the shareholders of the acquired corporation receive less than twenty percent of the total fair market value of the outstanding shares of the acquiring corporation.

If § 382(b) applies to the transactions at issue in this case, the parties agree that the formula contained in § 382(b)(2) would result in a reduction of 50% of the net operating loss carryover available to the taxpayer from the Victor Paint Company subsidiaries, and a reduction of 95% of the net operating loss carryover available from the Biff-Burger corporations.

The technical workings of the Code make this problem appear substantially more difficult than it actually is. The taxpayer acquired the stock of the Victor Paint Company subsidiaries through a statutory merger[4] with Victor Paint; it acquired the stock of the Biff-Burger corporations through stock for stock exchanges.[5] If the subsequent liquidations of these corporations were as a part of a serial set of transactions,[6] intended at the time of the initial tax-free reorganization through which the liquidated corporations' shares were obtained, then § 382(b) applies. If the tax-free reorganizations are distinct from the subsequent liquidations, then § 332 would permit the taxpayer to carryover the losses without reduction. As the Tax Court framed the issue, the relevant question here is whether there was an intent on the part of the taxpayer to continue the operations of[5] the Victor Paint subsidiaries and the Biff-Burger Corporations after they were acquired.

The Tax Court found in both sets of transactions that the taxpayer did not have such an intention to maintain the operations of the liquidated corporations, but rather made the decision to liquidate the corporations as part of both the statutory merger, and the stock for stock exchanges, and that the liquidations were thus part of a continuing series of transactions. There is no reason to rehearse the various facts which the Tax Court relied upon in making this determination. We are satisfied that the record fully supports the court's finding that the liquidations were part of a continuing series of transactions, and would not support a determination that the decisions to liquidate the various corporations were made entirely apart from the initial decisions to enter into a statutory merger and the stock for stock exchanges. In our view, the Tax Court was fully justified in finding that § 382(b) applies, and that the net operating loss carryforwards must be accordingly limited.

## III.

### FRANCHISE TRANSFERS

The Commissioner challenged the taxpayer's claim that the gains it realized from the sales of the 7 Victor Paint Stores and the 8 Biff-Burger Restaurants should be taxable at capital gains rates which §§ 1221 and 1222 of the Code permit for gains arising from the "sale or exchange" of a capital asset. The Commissioner's deficiencies were based both on his determination that the transfers of the restaurants and paint

---

**4.** *See* § 368(a)(1)(A).

**5.** *See* § 368(a)(1)(B).

**6.** *See, e. g.,* discussion in Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 96,

88 S.Ct. 1517, 20 L.Ed.2d 448 (1968); *see generally* Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (3d ed.) 14–101 et seq.

stores were not sales, but rather mere licensing arrangements, and in the alternative that if they were to be considered as sales, the franchises which were transferred were held in the taxpayer's ordinary course of business "primarily for sale to customers." The Tax Court found that the transfers of the Biff-Burger Restaurants were licensing arrangements, rather than sales of franchises, but found for the taxpayer on the transfers of the Victor Paint Stores. In our view, the Tax Court's decision that the transfers of the Biff-Burger Restaurants were licensing arrangements, and not sales, applies with equal force to the transfers of the Victor Paint Stores. Thus, in our view, all 15 of the transfers were licensing arrangements, rather than sales of a capital asset, and should be taxable at the ordinary income rates. Because we hold that the transfers were something other than a sale of a capital asset, we do not reach the further question whether the franchises were held in the taxpayer's ordinary course of business, and thus were not capital assets within the meaning of §§ 1221(1) and (2).

In analyzing agreements between manufacturers and their distributors or dealers to determine whether the agreement constitutes a license or the sale of a franchise, the problem is to determine the extent to which the transferor retains sufficient proprietary rights in the franchise that the rights transferred to the dealer are insufficient to constitute the sale of a franchise. The leading cases on this question all involve transfers of Dairy Queen franchises to dealers. See Dairy Queen of Oklahoma v. Commissioner of Internal Revenue, 250 F.2d 503 (10th Cir. 1957); Moberg v. Commissioner of Internal Revenue, 305 F.2d 800 (5th Cir. 1962); Gowdey's Estate v. Commissioner of Internal Revenue, 307 F.2d 816 (4th Cir. 1962); Moberg v. Commissioner of Internal Revenue, 310 F.2d 782 (9th Cir. 1962); United States v. Wernentin, 354 F.2d 757 (8th Cir. 1965). This Court has held that certain restrictions on the right to operate a franchise can be permitted, and the sale can still constitute the sale of a franchise, if the restrictions "were designed to maintain quality, sanitary dispensing conditions, uniform standards for the trade named product, protect each sub-franchise purchaser as against other purchasers in respect to territory, protect the seller in respect to the contract . . ., and to insure the ascertainment and collection of contractual sums due . . . " Moberg v. Commissioner of Internal Revenue, 305 F.2d at 806.[7] However, even where a restriction similar to those involved in the franchise agreements in this case have been upheld as sales of franchises rather than licenses, the Courts have emphasized that the agreements involved the "sales of the exclusive and perpetual right" to use the trademark and equipment transferred by the agreement. See Moberg v. Commissioner of Internal Revenue, 305 F.2d 800, 806 (5th Cir. 1962); Dairy

---

7. The Circuits are split as to how restrictive a franchise agreement can be before involving such proprietary rights that the agreement constituted a licensing arrangement rather than a sale. The Fourth and Tenth Circuits permitted restrictive categories similar to those sustained by this Court in Moberg v. Commissioner of Internal Revenue, 305 F.2d 800 (5th Cir. 1962) while the Eighth and Ninth Circuits imposed far more restrictive tests on what constituted a sale of a franchise. See Dairy Queen of Oklahoma v. Commissioner of Internal Revenue, 250 F.2d 503 (10th Cir. 1957); Gowdey's Estate v. Commissioner of Internal Revenue, 307 F.2d 816 (4th Cir. 1962); Schmitt v. Commissioner of Internal Revenue, 271 F.2d 301 (9th Cir. 1959); Moberg v. Commissioner of Internal Revenue, 310 F.2d 782 (9th Cir. 1962); United States v. Wernentin, 354 F.2d 757 (8th Cir. 1965); and Leisure Dynamics, Inc. v. Commissioner of Internal Revenue, 494 F.2d 1340 (8th Cir. 1974).

This conflict was resolved for the future in 1969 by the inclusion of § 1253 in the Code. § 1253 denies capital gains treatment to the transfer of a franchise, trademark or trade name if the transferor retains "any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name." See 1969 U.S. Code Cong. & Admin.News, 2241–2242, S.Rep. No.91–552, 91st Cong., 1st Sess. (1969).

Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, 250 F.2d at 506; Gowdey's Estate v. Commissioner of Internal Revenue, 307 F.2d at 819. Here it is clear that the franchise agreements transfer neither exclusive nor perpetual rights to use the Biff-Burger or Victor Paint Company trade name. In the case of the Biff-Burger transfers, the agreement specified a term of 15 years, while the Victor Paint agreements provided the transferee had the right to use the Victor trade name for only 1 year, after which time the agreement was automatically renewable unless either party chose to terminate. In both cases the limited rights granted to the transferee could not be transferred without the taxpayer's consent and, most strikingly, the taxpayer retained the right to fix the franchisee's prices.

In our view, these restrictions and limitations are clearly so substantial as to be incompatible with the sale of absolute and perpetual rights. The Tax Court found that the Biff-Burger transfers were mere licenses, and the resulting gains represented ordinary income. With this conclusion we agree. The court also found that the Victor Paint transfers "could hardly be considered the sale of a 'franchise' as that term is commonly understood by the courts," yet inexplicably held that the Victor Paint transfers were entitled to capital gains treatment because the transactions concerned sales of "going businesses." We do not understand how that conclusion could have been reached. The Tax Court found that the only right obtained by the transferee not otherwise freely available was the right to use the trade name "Victor Paint" and that the taxpayer reported the gain over the amount attributable to the sale of fixtures in each of the Victor Paint stores as "good will"—and it was on this basis alone that the Tax Court found that the gain was from a sale of a capital asset. In our view, once the Tax Court had found that the franchise agreements were not in fact sales of franchises within the meaning of that term, then the gain received by the taxpayer on the transfers of the

Victor Paint dealerships must be a gain from licensing arrangements, as distinguished from the gain from the sale of a business. Accordingly, the gains from the transfers of both the Biff-Burger Corporations and the Victor Paint stores are ordinary income, rather than capital gains, and the Commissioner's deficiency determinations should have been upheld.

Affirmed in part and reversed in part.