**The CONDE NAST PUBLICATIONS, INC., Plaintiff-Appellee and Cross-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellant and Cross-Appellee.**

**Nos. 478, 628, Dockets 77–6090 and 77–6101.**

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1978.

Decided April 24, 1978.

William G. Ballaine, Asst. U. S. Atty., S. D. of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., and Thomas E. Moseley, Asst. U. S. Atty., S. D. of New York, New York City, of counsel), for defendant-appellant and cross-appellee.

John R. Coughlin, New York City (Sabin, Bermant & Blau, New York City, of counsel), for plaintiff-appellee and cross-appellant.

Before HAYS and GURFEIN, Circuit Judges, and BRYAN, District Judge.*

GURFEIN, Circuit Judge:

The taxpayer, Conde Nast Publications, Inc., brought a suit in the United States District Court for the Southern District of New York, under the jurisdiction conferred by 28 U.S.C. § 1346(a)(1), for a refund of income taxes paid for the calendar years 1967 and 1968. The case turned on whether certain installment payments received by the taxpayer in connection with the sale of its pattern business to the Butterick Company and the transfer of the use of the trademark "Vogue" to Butterick in connection therewith were payments of royalties for a license, in which case the payments would be ordinary income, or were installment payments on the purchase price for the sale of a capital asset held more than six months, in which case they would be treated as long-term capital gains. The Commissioner of Internal Revenue ruled that all of the payments were ordinary income. The District Court held that the payments attributable to Butterick's sale of patterns under its own name were to be treated as long-term capital gains, but that

the payments attributable to its sale of "Vogue" patterns were ordinary income, and ordered a refund accordingly. We hold that all of the payments by Butterick or its successor in interest, the American Can Company, made during 1967 and 1968 should properly be treated as long-term capital gains arising from the sale of capital assets, and therefore reverse that part of the judgment which held certain payments to be ordinary income.

Conde Nast Publications, Inc. ("the taxpayer") transferred its entire dress pattern business to Butterick Company, Inc. ("Butterick") in 1961. Prior to that date, the taxpayer had conducted both the dress pattern business and its principal business, the publication of ladies' fashions magazines, under the trademark and trade name of "Vogue." The Vogue trademark and trade name were then, and continue to be, registered by the taxpayer throughout the world for use in connection with both dress patterns and publications.

The 1961 sales agreement provided for the sale of the Vogue pattern business to Butterick as a going concern. An essential part of the deal was the right of Butterick to use the "Vogue" name in the pattern business. To accomplish this purpose and at the same time to allow the taxpayer to continue its use of the trademark and trade name "Vogue" in conjunction with its fashion magazine business, the taxpayer and Butterick entered into a "licensing agreement." By the terms of this agreement the taxpayer granted Butterick "the sole and exclusive right and license to use the trademark 'Vogue' in the United States, Canada, England and Australia" as well as anywhere else in the world where it could lawfully do so in connection with its paper *dress pattern* business.

The licensing agreement imposed a number of restrictions on Butterick's use of the Vogue trademark and name. Butterick was allowed to use the "Vogue" mark only

---

* Honorable Frederick vanPelt Bryan, United States District Judge for the Southern District of New York, sitting by designation. Judge

Bryan concurred in this opinion before his death.

on patterns and pattern promotional material "which are dignified and of high quality." The standard of quality was specified in detail, and the taxpayer was given the right to inspect all patterns and promotional materials bearing the Vogue name to ascertain Butterick's compliance with the standard of quality.

In addition to the quality control provisions, as the District Court found, the taxpayer also had the right to terminate the agreement under certain conditions: (1) if Butterick failed to make timely payment of duly demanded royalties under the license agreement or of principal and interest due under the contract of sale; (2) if Butterick was adjudicated a bankrupt; (3) if Butterick ceased to engage in the business of selling dress patterns, unless it assigned the business as described *infra* ; (4) if the majority of Butterick's issued and outstanding voting stock was transferred to a person or corporation engaged in the publication of ladies' fashions magazines, or if Butterick itself entered into that business, unless the taxpayer had at that time ceased its publishing business; (5) if Butterick made an assignment or sublicense inconsistent with the restrictions in the license (see *infra* ); or (6) if Butterick failed to pay the minimum annual payment of $1,000. Upon termination of the license, all right to the Vogue name in the pattern business would revert to the taxpayer.

The license agreement also restricted Butterick's right to assign the license or grant sublicenses. This it could only do with the taxpayer's written consent, which, however, the taxpayer promised not to withhold "unreasonably." The taxpayer did have an absolute right to withhold its consent to an assignment or sublicense to anyone engaged in the publication of ladies' fashion magazines (if the taxpayer was at the time still engaged in the business), or to anyone who did not also acquire Butterick's pattern business. The taxpayer retained the right to bring infringement actions, though Butterick could proceed on its own if the taxpayer failed to act after notification from Butterick of a possible infringement.

In consideration for the transfer of the dress pattern business and the Vogue name in that business, Butterick agreed in the sales and licensing agreements to pay to the taxpayer a lump sum plus an annual payment equal to 1% of all sales of dress patterns by Butterick (*including Butterick as well as Vogue patterns*) The licensing agreement, as we have seen, provided for a minimum annual payment of $1,000. When Butterick was purchased by the American Can Company in 1967, as a going concern, this minimum annual "royalty" was increased to $25,000 in return for the taxpayer's consent to the assignment of Butterick's rights in the licensing agreement to American Can Company, which the latter required since it was purchasing assets rather than shares of stock.

In 1967 and 1968, the taxpayer reported the annual payments it received from Butterick as long-term capital gains. The Commissioner made additional assessments for these two years after concluding that the annual payments should be treated as ordinary income and not as long-term capital gains under § 1201 of the I.R.C. of 1954.[1] The taxpayer paid an additional assessment of $98,842.23 for the year 1967 and of $91,534.18 for the year 1968. On January 15, 1973, the taxpayer filed a timely claim for refund of $36,913 for overpayment of 1967 income taxes and $45,865 for overpayment of 1968 income taxes. Upon rejection of its claim, the taxpayer brought this action for a refund.

The District Court held that the annual payments attributable to sales of Butterick patterns were properly treated as capital gains while those attributable to sales of

---

1. Section 1253 of the I.R.C. of 1954 provides specific rules for the tax treatment of transfers of trademarks and trade names. It was added to the Code in 1969 and applies only to transfers made after December 31, 1969. The transfer in this case occurred in 1961, and § 1253 is therefore inapplicable. Further, since § 1253 is an attempt to resolve the problems and uncertainties in the previously existing law in this area, it cannot even be consulted as a guide to or codification of the rules applicable at the time of the transfer in the present case.

Vogue patterns must be treated as ordinary income. From this decision the United States has appealed and the taxpayer has cross-appealed.

The principal question on appeal is whether the annual payments received by the taxpayer in 1967 and 1968 are properly treated as capital gains. The answer depends on whether the 1961 transfer of the use of the trademark and name in the pattern business was a "sale" within the meaning of § 1222 of the I.R.C. of 1954, or was only a license of the use of the trademark and name which did not amount to a sale.

■ There is no doubt that "payment for the transfer [of a trade name] need not be in the form of a lump sum to constitute capital gain but may take the form of a percentage of sales or profits." *Rose Marie Reid*, 26 T.C. 622, 632 (1956), *acq.* 1956–2 C.B. 8. In *Reid*, the taxpayer transferred all of the rights to the use of her trade name in the United States, along with other business property, in return for 1% of net sales of the transferee. In two subsequent revenue rulings, the Commissioner adopted a similar approach to annual payments based on sales or profits when made in consideration for the transfer of rights to patents and copyrights.[2] With regard to transfers of copyrights, for example, the Commissioner adopted the following position in Revenue Ruling 60–226, 1960–1 C.B. 26:

"[T]he consideration received by a proprietor of a copyright for the grant transferring the exclusive right to exploit the copyrighted work in a medium of publication throughout the life of the copyright shall be treated as proceeds from a sale of property regardless of whether the consideration received is measured by a percentage of the receipts from the sale, performance, exhibition, or publication of the copyrighted work, or is measured by the number of copies sold, performances given, or exhibitions made of the copyrighted work, or whether such receipts are payable over a period generally coterminous with the grantee's use of the copyrighted work."

The proper tax treatment of annual payments is a more difficult question when there are annual payments based on the transferee's use of the asset and less than all of the rights in some distinct and separable use of the trademark or copyright are transferred. This court considered the general problem in a copyright case in *Cory v. Commissioner of Internal Revenue*, 230 F.2d 941 (2d Cir.), *cert. denied*, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50 (1956). Cory, the owner of the copyright of an autobiography, transferred to a publisher only the rights for publication in the United States and Canada, reserving the publishing rights in England and other English-speaking countries, the foreign language publishing rights, and motion picture and dramatic production rights. The publisher agreed to pay Cory a percentage of future sales. The court held that because there was a transfer for an amount wholly indeterminable at the time of the transfer *and* only a "part of the cluster of rights" making up the copyright was transferred, there was no sale for capital gains purposes. 230 F.2d at 944. In *Cory, supra*, there was not a grant of "the *exclusive right* to exploit the copyrighted work in a *medium of publication*", so that Revenue Ruling 60–226 (1960) cannot be taken to overrule *Cory* or to disagree with *Cory*.

■ *Cory* and Revenue Ruling 60–226, read together, however, do clearly contemplate that the transfer of the exclusive right to exploit the copyrighted work in a *single medium of publication, e. g.,* in printed form, with reservation to the transferor of rights in other media, *e. g.,* motion pictures or dramatic production, would constitute a sale even if the consideration was received in the form of annual payments linked to the sales or net profits of the

**2.** The Commissioner's acquiescence in three Tax Court rulings applying this rule to transfers of patents, Revenue Ruling 58–353, 1958–2 C.B. 408, only brought the Commissioner's position into accord with § 117 of the I.R.C. of 1939, as amended, and § 1235 of the I.R.C. of 1954.

transferred property. The right of exploitation within each of the separable and distinct media would be treated as an entire "cluster of rights" for purposes of deciding whether a sale had been made. In the present case, unlike *Cory,* the taxpayer did transfer a complete bundle of rights in a distinct and separable portion of the trademark and name. The parties stipulated and the District Court found that the trademark and name "Vogue" are registered throughout the world for use in connection with *both* patterns and publications. The trademark and name had acquired secondary meanings in two distinct and separable businesses, and the taxpayer transferred the rights to the use of the trademark and name in *one* of the businesses at the same time that it sold that business as a going concern.

Though we hold that the rule announced in *Cory* is inapplicable in this case, we must still determine whether the transfer to Butterick of the rights to the use of the Vogue trademark and name in the pattern business constituted a sale or only a license for § 1222 purposes. The standard to be applied in such a case as this was stated in *Leisure Dynamics, Inc. v. Commissioner of Internal Revenue,* 494 F.2d 1340, 1343–44 (8th Cir. 1974), quoting from the opinion of the Tax Court in the same case:

> "Although the courts have struggled to define the amount of control necessary to turn an apparent sale into a license, retention by the transferor of a substantial right in the transferred property or the continued participation of the transferor in the transferee's business is the touchstone of a license."

*Accord, Resorts International, Inc. v. Commissioner of Internal Revenue,* 511 F.2d 107, 111 (5th Cir. 1975). In the *Leisure Dynamics* case, the transferee of a right to manufacture and distribute "Gumby" dolls claimed a business expense deduction for royalties paid to the transferor amounting to a percentage of the transferee's net sales of the dolls. The transferor retained the related business of showing "Gumby" film strips on television, and was obligated by the terms of the transfer to try to ensure the showing of the film strips. The court concluded, under the test quoted *supra,* that since the rights to manufacture and distribute the dolls were "relatively worthless" without the television exhibition of the film strips, the transferor retained sufficient control over the sale of the dolls to make this a license rather than a sale.

The courts applied a similar standard in the *Dairy Queen* cases,[3] though the transactions considered there resembled closely the limited transfer in *Cory* rather than the transfer of rights in an entire line of business. Dairy Queen and its sub-franchisors were in the sole business of franchising the use of the Dairy Queen name and patents in numerous limited territories, and derived their sole "Dairy Queen"-related income from these franchises in the form of lump sum payments and annual royalties based on the business done by the franchisees. Because of this significant factual difference from the transaction in the present case, the various conclusions of the *Dairy Queen* courts on the proper tax treatment of the annual royalty payments involved in those cases are not conclusive. Those cases, however, do support the use of the analysis employed by the court in *Leisure Dynamics, supra,* and which we adopt in the present case. Judge (now Justice) Blackmun summarized the basic issue clearly in *United States v. Wernentin, supra,* 354 F.2d at 766:

> "One could say that in these cases the courts appear to be struggling to accommodate, on the one hand, the continuing interest of transferors whose compensation is largely dependent on future profitable use of the transferred rights with, on the other hand, the traditional notion that a seller divests himself of substan-

---

3. *Gowdey's Estate v. Commissioner of Internal Revenue,* 307 F.2d 816 (4th Cir. 1962); *Moberg v. Commissioner of Internal Revenue,* 305 F.2d 800 (5th Cir. 1962); *United States v. Wernentin,* 354 F.2d 757 (8th Cir. 1965); *Moberg v. Commissioner of Internal Revenue,* 310 F.2d 782 (9th Cir. 1962); and *Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue,* 250 F.2d 503 (10th Cir. 1957).

tially all control over property sold. The difficulty lies in finding a legitimate place to draw the line between the reservation of sufficient rights and restrictions to protect one's continuing financial interest and the reservation of rights to continuing participation in the business on such a scale that it cannot properly be said that there was a sale. Any line will necessarily be drawn arbitrarily."

The taxpayer transferred to Butterick the use of the trademark and name "Vogue" in the dress pattern business at the same time that it sold its dress pattern business to Butterick as a going concern. The parties stipulated that most of the restrictions which the licensing agreement imposed on Butterick's use of the trademark and name were meant "to preserve the value and reputation of the 'Vogue' tradename." Stipulation of the parties, ¶ 9. Judge Cannella found that "each and every provision of the License Agreement which restricts Butterick's use of the Vogue name was intended primarily to protect the value and reputation of the Vogue name for its use by [the taxpayer] in the publication of Vogue Magazine." We see no reason to disagree with Judge Cannella, since neither the quality control provisions nor the restrictions on termination or assignment of the license agreement gave the taxpayer any significant continuing interest or participation in Butterick's pattern business.

The quality control provisions gave the taxpayer merely the right to demand that only "high quality" dress patterns should be associated with the Vogue name, and are referable to the protection of the Vogue trademark in the magazine business, which the taxpayer retained. The restrictions on assignment also insured that the use of the

Vogue name and mark in the dress pattern business would not pass into the hands of (1) another ladies' fashions magazine publisher or (b) a company which, unlike Butterick, had no complementary low-priced line of patterns and which might therefore more readily and frequently devalue the Vogue name by associating it with low-priced patterns.[4]

■ The taxpayer's termination rights, aside from allowing termination if Butterick failed to pay the lump sum or annual payments due under the sales and license agreements, or if Butterick violated the restrictions on assignment, provided for termination if Butterick came under the control of another publisher of ladies' fashions magazines, or if it ceased to be in the dress pattern business because of bankruptcy or some other reason. This latter termination provision ensured that the license agreement would not, by way of Butterick's bankruptcy, pass into the hands of one who could not otherwise acquire it under the terms of the license agreement, e. g., another publisher of ladies' fashions magazines. Conditions subsequent, such as reversion on bankruptcy, will not defeat capital gains treatment. *Merck & Co. v. Smith,* 261 F.2d 162, 164 (3d Cir. 1958); *Gowdey's Estate v. Commissioner of Internal Revenue,* 307 F.2d 816, 819 (4th Cir. 1962).

■ We conclude that the taxpayer had no continuing interest in or control over the use of the Vogue name in the pattern business, and no continuing participation in Butterick's business, sufficient to convert this transfer from a sale into a license.[5] The taxpayer had no power to set Butterick's business policies, *compare Resorts International, Inc. v. Commissioner of Inter-*

---

4. In addition to the two absolute restrictions on assignments, all assignments were subject to the taxpayer's approval, but the taxpayer committed itself not to withhold its approval "unreasonably." In the absence of any evidence to the contrary, we assume that this provision was only meant to protect the taxpayer's continuing interest in the ability of Butterick and its successors to pay the annual installments of the purchase price. That continuing interest is consistent with treatment of the transfer as a

sale; *see United States v. Wernentin, supra,* 354 F.2d at 766.

5. It is consistent with our conclusion that the parties stipulated that the taxpayer never in fact took any part in Butterick's Vogue pattern business, except to object on several occasions to the design of the masthead on Butterick's "Vogue Pattern Book" because of the possibility of confusion with "Vogue Magazine."

nal Revenue, supra (transferor had right to set transferee's prices), nor was Butterick's Vogue pattern business "relatively worthless" without control over the Vogue Magazine business of the taxpayer, compare Leisure Dynamics, Inc. v. Commissioner of Internal Revenue, supra (right to manufacture and distribute Gumby dolls "relatively worthless" without control over exhibition of Gumby television film strips). The aim and effect of the licensing agreement were not to give the taxpayer any significant continuing interest or participation in the Vogue pattern business but to protect the value of the right it retained to use the Vogue name in the fashion magazine business.

The Government argues, however, that the conclusion that this transfer was a sale for § 1201 purposes must be rejected because of conduct of the parties subsequent to the 1961 transfer. The Government's primary contention is that the 1967 amendment of the licensing agreement, raising the minimum annual payment to the taxpayer, is inconsistent with an earlier completed sale. But this amendment was made contemporaneously with the taxpayer's consent to the assignment of the license to American Can Company, a consent which the taxpayer might have argued it could reasonably withhold under the 1961 licensing agreement. Since we have already concluded that the taxpayer's control over assignments in the 1961 agreement was not inconsistent with a completed sale in 1961, we see no grounds for holding that the later exercise of that control was inconsistent with a completed sale in 1961.

The Government also points to the taxpayer's treatment of the annual payments as ordinary income in 1963–1966, and Butterick's consistent treatment of the payments as a royalty deductible as a § 162 business expense, as conduct inconsistent with treatment of the 1961 transfer as a sale. There was no agreement between the taxpayer and Butterick fixing their respective tax treatments of the annual payments in accord with Butterick's approach, see, e. g., Leisure Dynamics, Inc. v. Commissioner of Internal Revenue, supra, 494 F.2d at 1347, nor has there been a judicial determination approving Butterick's treatment of the annual payments. Hence, we see no reason to force the taxpayer into consistency with Butterick's tax treatment of the payments. Nor do we see any reason to require the taxpayer to continue what we have concluded to have been its mistaken reporting of the payments as ordinary income in 1963–1966, especially in view of the lack of clarity of the law in this area.

The transfer of the use of the Vogue trademark and name in the dress pattern business was a sale within the meaning of § 1222, and we affirm the decision of the District Court on this point. The price paid for the transfer of the property was 1% of the annual sales of Butterick and Vogue patterns. The taxpayer was entitled to report the *entire* amount of the annual payments for 1967 and 1968 as capital gains. We therefore reverse the judgment of the District Court only insofar as it limited capital gains treatment to a part of the annual payments, and remand the case for amendment of the judgment in conformity with this opinion.